Frieda Hempel v. Commissioner.
Hempel v. Commissioner
Docket No. 7993.
United States Tax Court
1947 Tax Ct. Memo LEXIS 177; 6 T.C.M. (CCH) 743; T.C.M. (RIA) 47183; June 23, 1947
Joseph Getz, C.P.A., 475 Fifth Ave., New York 17, N. Y., for the petitioner. Martin M. Lore, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves deficiencies in income taxes for the years 1937 and 1938 in the amounts of $4,098.10 and $1,167.65, respectively, and a deficiency in penalty for the year 1937 in the amount of $409.81 as well as an additional deficiency penalty *179 for the year 1937 in the amount of $614.71 claim for which was made in respondent's amendment to his answer filed pursuant to leave granted at the hearing. The issues to be determined are: (1) Should the petitioner be allowed the alleged professional expenses claimed for the years 1937 and 1938 in the amounts of $9,493.07 and $11,985.78, respectively? (2) Should the amounts received by the petitioner during the years 1937 and 1938 from August Heckscher or from the August Heckscher Trust be included as taxable income during those years? (3) In the alternative, if these amounts be found to constitute income should they be taxable when distributable rather than when received? (4) Should petitioner be allowed a credit for a dependent by reason of her being the chief support of a niece during 1937 and 1938? (5) Should petitioner be allowed a deduction for interest alleged to have been paid in 1937 and 1938 in the amounts of $590 and $651.42, respectively? (6) Should the delinquency penalty with respect to petitioner's return for the year 1937 be calculated at the rate of 25 per cent instead of 10 per cent as determined in the deficiency notice? From evidence, both documentary and oral, *180 we make the following Findings of Fact Petitioner is a naturalized citizen of the United States and resides in New York City. Her income tax returns for the years 1937 and 1938 were filed with the collector of internal revenue for the third district of New York. Petitioner is an opera and concert singer of international fame. She made her American debut at the Metropolitan Opera House in 1912 or 1913. Five or six years prior to that she had made her debut in Europe. With fame came financial success and during the early 1920's, after petitioner had left the Metropolitan, she formed her own concert organization and sang at as many as a hundred concerts a year. These included the famous "Jenny Lind" series both in Europe and this country. William B. Kahn married petitioner in 1918 and acted as her manager from 1918 until 1926 when they were divorced. Prior to April 1926 petitioner became acquainted with August Heckscher, a wealthy philanthropist, living in New York City. In April 1926 petitioner entered into an agreement with him which provided that she would not accept any professional engagements which would require an absence of more than two days at a time from the City *181 of New York during the rest of her life, and would sing exclusively for charitable organizations whenever he requested her to do so. Heckscher agreed to pay her the sum of $48,000 annually beginning with quarterly payments on July 1, 1926. After the first payment by Heckscher, payments were discontinued and in 1927 petitioner commenced an action in the New York Supreme Court against him for breach of contract. Subsequently, and before the suit came to trial a settlement out of court was agreed on. As a part of the settlement Heckscher set up a trust fund on or about May 11, 1928, for the benefit of petitioner under which she was to receive $15,000 annually during the remainder of her natural life. The trust instrument provided that if the net income of the trust was not sufficient to pay $15,000 per annum to petitioner, Heckscher during his life, and his legal representatives after his death, would pay to the trustees an amount in cash sufficient, when added to the trust income, to make a total of $15,000 (after deduction of trustees' expense and compensation only). The trust instrument also provided that neither Heckscher nor his legal representatives should be required in any year *182 to pay to the trustees or to the petitioner an amount to make up any deficiency in income due to the payment of taxes in respect to the trust or the income thereof, all taxes being for the account of petitioner only and being assumed by her without any obligation on the part of Heckscher or his legal representatives. The trust instrument recites that the parties contemporaneously entered into two other agreements. By one of the instruments petitioner agreed to save Heckscher harmless from any action by petitioner's former husband on account of or by reason of any relation of Heckscher to petitioner. By the other instrument, after reciting the consideration, the parties, Heckscher and petitioner, agreed to surrender and deliver to each other all writings, communications, letters, telegrams, cablegrams and radiograms from each to the other. They further agreed that they would neither publish nor suffer to be published any of the contents of the writing or communications, nor any facts nor statements of or concerning any business, financial or personal relationship or transaction between them, and that neither would publish or cause or suffer to be published any statement with respect *183 to or concerning any financial or other adjustment made, or any payment made or promised to be made, and that neither would leave or preserve any such writing concerning the matters for publication at any time, either before or after the death of either. Further, that neither would at any time communicate with or molest or otherwise interfere with the peace, quiet and happiness of the other, or permit or suffer the same to be done with her or his knowledge or consent. They also agreed to cremate the above mentioned writings upon delivery and receipt of them and to execute and deliver a joint certificate or letter of cremation in such form as their respective counsel might approve. The agreement was also to be binding upon and should inure to the benefit of the heirs, executors and administrators of both parties. The instrument stated that both parties released the other, his or her heirs, executors' and administrators from all manner of actions or suits, etc., excepting only the obligations of the indenture above mentioned and the terms and provisions of the indemnity agreement of even date. The trust instrument also provided that if petitioner failed to perform the terms and provisions *184 of such agreements the trust created for her benefit might, at the option of Heckscher or his legal representatives be terminated, at which time the corpus of the trust should be paid over to certain charitable corporations as set forth in the trust instrument. Other than this provision for termination, the trust was to continue for the life of the petitioner, and upon her death the corpus was to go to the benefit of certain charitable corporations. The payments provided by the trust agreement were duly made until the latter part of 1935 when Heckscher alleged that petitioner had violated the agreements with respect to certain matters and she was informed that the payments were to be discontinued and the trust terminated in accordance with the provisions, above mentioned. Petitioner thereupon instituted legal proceedings against Heckscher, William Dickinson Hart, and George F. Thompson (who were the trustees in the trust above mentioned), to require performance with respect to the annual payments to her. Three separate suits were filed by petitioner in the New York Supreme Court. One of the suits was for the payments due December 1, 1935, another for the two payments due March 1, 1936, and *185 June 1, 1936, and a third suit for the payment due September 1, 1936, plus, in each case, interest from the due date of each payment. Summons and complaints were served upon the defendants in which appeared orders that if Heckscher did not pay the amount due in the particular suit to the defendants Hart and Thompson within five days after the service of the orders, then petitioner was to have judgment against Heckscher for the amounts due. (Should Heckscher pay the amount of the suits to the other defendants, then petitioner was to have judgment against them.) Judgment was entered against Heckscher only in the three suits, under dates of June 2, 1936, July 28, 1936, and December 28, 1936. The judgments were satisfied on February 5, 1937, by Heckscher's payment of the amount due to petitioner's attorneys. On or about January 28, 1937, petitioner received payment from Heckscher through her attorneys in the amount of $15,555.62. This amount represented payment of $19,751.89 by Heckscher direct to petitioner's attorneys in settlement of the above mentioned judgments and a deduction of $4,196.27 for attorneys' fee and disbursements. Petitioner claimed $1,500 of the above mentioned *186 attorneys' fee as expenses against the trust payment included in her 1937 income tax return. No income was received or paid out by the trustees of the Heckscher trust during the year 1937. During 1937 Heckscher, in compliance with the provisions and obligations set forth in the trust instrument, paid over to the trustees $15,000 to compensate for deficiency in income to that amount and which was later transmitted to the petitioner by the trustees. Both petitioner and the above-mentioned trust reported their income and deductions on the cash basis in the years 1937 and 1938. Petitioner reported $13,500 for 1937 and $15,000 for 1938 as income from the Heckscher Trust. Under the date of December 31, 1934, petitioner received a letter from her attorney to the effect that she should not be oversanguine about the continuance of "these payments" and that Heckscher was in great financial distress and that "the 57th Street and Fifth Avenue property" was either under foreclosure or had already been foreclosed, and that that feature of her security was, or shortly would be, wiped out. After receiving this letter she consulted with her former associates, William B. Kahn and Lois Willoughby *187 (the latter served at times as her secretary), and decided that she would make a European tour. Petitioner left the United States during April 1935 for a European tour and had no intention, at that time, to reside abroad. She kept her nine room apartment in New York and had a maid there during the time she was abroad. The purpose of this tour was to earn money. While on this tour petitioner did not visit pleasure resort places like Cannes, Nice, Carlsbad, or Monte Carlo. She did spend a month or a month and a half at St. Moritz. When in London during the latter part of 1935, petitioner saw agents and managers and a concert was arranged for January 20, 1936. Because of illness on the part of petitioner, this concert was postponed 11 days and due to a case of grippe, the postponed concert was canceled. Petitioner sang three times for the British Broadcasting Co. and also sang in May 1936 at Queens Hall in London. She went on a Scandanavian tour and sang at Oslo, Copenhagen, and Gotenburg. Petitioner sang at Bexhill, London, on May 10, 1936. A concert for Lady Cory was canceled because of the King's death. That summer she made "some" phonograph records at Berlin and in the fall interviewed *188 and negotiated with four or five managers in Paris for the following season. Petitioner left Europe and arrived in New York in February 1937. After arriving in New York she called upon managers, booking agents and radio people, seeking engagements. Advertising literature was prepared and mailed such as circulars containing reprints of European press notices. She found that she had arrived too late for the Spring booking, but devoted herself to developing a new repertoire which consisted of French and English works instead of German. During 1937 she sang at several concerts for charity, sang in church and also for the Pan-American Company just to keep in front of the public. Petitioner received no pay for these concerts but she did invite managers and other people who might be interested in giving her engagements. Attempts to obtain a motion picture contract were not successful. Henry Holt, her London manager, was in New York. When she saw him, he urged her to "come back" to London. In preparing for another European tour, she made contact with three managers in Paris, and sought the advice of Mr. Kahn and Miss Friedberg, her manager at that time. She expected to have a profitable *189 tour. Petitioner left for Paris April 22, 1938. Arrangements were made for a concert to be held in Paris for October 13, 1938, after which she held press interviews, saw newspaper people for publicity, worked on her repertoire and had rehearsals. Petitioner stayed in Paris until about July 1st, after which she went with her coach to Zurich, Switzerland. After a short stay in Zurich she went to St. Moritz, where she worked with her coach and sang at a charity concert for children. September 3rd she went back to Zurich and on September 9th she went back to Paris. During the summer she had arranged, by correspondence, a concert to be given in The Hague on October 3rd and one in Amsterdam on October 8th. These concerts were arranged on a percentage basis. Petitioner sang at these two concerts, but they were not successful, financially. The reason as expressed in a letter from the manager of the concert at The Hague to petitioner was as follows: "* * * the reason for the bad financial outcome was the most unfavorable political situation * * *." She returned to Paris for her concert which was to be held October 13th, but was canceled because of the war scare. She left Paris for New *190 York on October 19, 1938. The operation of a concert organization requires expensive advertising through circulars, posters, billboard sheets, musical trade papers, direct mailing of literature to concert halls and musical organizations. It was also customary to entertain concert managers to obtain concert engagements. Traveling expenses to the place of the concert had to be incurred as well as the expenses, salaries and fees of such associates as pianist, accompanist, flutist, and maid. Prior to about 1926, petitioner was often accompanied on her trips by her then secretary and/or her manager. An office is also necessary. In preparation for a concert, it is often necessary to buy special music, and to hold consultations with professional coaches, who, among other things, help choose the repertoire. Special theatrical costumes and make-up are necessary expense. Miss Lois Willoughby was secretary to the petitioner until about 1926, and often went on trips with her. Thereafter she was not definitely in the employ of the petitioner, but lived in Rhode Island, and on occasions came to see the petitioner, and on some such occasion prepared for her Exhibits 10, 26 and 26a (relied on *191 as proof of payments of expenses). Petitioner claimed, on her Federal income tax returns, the following as expenses in connection with her business or profession for 1937 and 1938: 1937
Rent
$1,000.00
Secretary
1,500.00
Advertising & Music
400.12
Advertising Material
351.80
Coach
2,605.92
Publicity
850.00
Travelling Expense
666.00
Manager & Manager's Expense
650.00
Telephone & Telegraph
191.78
Auto Expense
$340.00
1/2 for Profession
170.00
Costumes
250.00
Entertaining
681.11
Cosmetics
149.57
Miscellaneous: Piano Tuning & Moving
$46.00
Auditions
13.75
Miscellaneous
66.02
125.77
TOTAL
$9,592.07
1938
Rent
$ 1,000.00
Secretary
1,500.00
Studio & Concert Hall Expenses
1,315.38
Entertainment
628.72
Travelling & Hotel Expenses
3,833.43
Coach
1,817.00
Wardrobe & Maintenance
645.78
Advertising & Music
302.16
Cosmetic & Makeup
22.11
Professional Fees
150.00
Telephone & Telegraph
80.09
Office Supplies
52.58
Advertising Material
144.78
Manager's Expense
90.32
Insurance
174.30
Storage
4.50
Publicity
170.00
Miscellaneous
70.83
TOTAL
$12,001.98
*192 Petitioner's ordinary and necessary expenditures paid for such items are: 1937
Rent
$ 500.00
Secretary
100.00
Advertising and music
200.00
Advertising material
175.00
Coach
1,300.00
Publicity
400.00
Traveling expense
400.00
Manager and manager's expense
500.00
Costumes
125.00
Entertainment
350.00
Cosmetics
50.00
Total
$4,100.00
1938 *
Rent
$ 500.00
Secretary
100.00
Studio and concert hall expense
200.00
Entertainment
300.00
Coach
300.00
Advertising and music
100.00
Cosmetics and makeup
5.00
Office supplies
30.00
Advertising material
70.00
Manager's expense
40.00
Publicity
35.00
Miscellaneous
15.00
Total
$1,695.00
Petitioner, prior to March 15, 1938, filed a request for an extension of time within which to file her 1937 income tax return. The request was not granted. Her return for 1937 was filed on August 12, 1938. The petitioner's gross receipts and expenses from her alleged profession for the years 1931 to 1942, inclusive, as shown by her Federal income tax returns *193 for those years are as follows: Gross
Expenses
Net Loss
Receipts
Claimed
Deducted
1931
$2,063.10
$15,964.52
$13,901.42
1932
0
9,804.28
9,804.28
1933
0
11,793.80
11,793.80
1934
750.25
12,130.39
11,380.14
1935
0
7,121.87
7,121.87
1936
1,165.21
10,641.17
9,475.96
1937
99.00
9,592.07
9,493.07
1938
16.20
12,001.98
11,985.78
1939
981.95
14,922.03
13,940.08
1940
1,350.00
11,624.60
10,274.60
1941
627.50
10,692.01
10,064.51
1942
350.00
14,133.38
13,783.38
Petitioner contributed approximately $400 during each of 1937 and 1938 to her niece Gertrude Freund, a person over 18 years of age, who resided in Berlin, Germany. The niece did not own any property and had been in a hospital for a tumor operation and a broken leg, and was incapable of self-support; she resided with her foster mother who was not able to contribute to her support. Her parents were deceased. During the period from 1927 to 1937, petitioner had borrowed sums totaling approximately seven or eight thousand dollars from Rosa Seidl, her maid and companion. On February 20, 1937, petitioner gave to Rosa Seidl two checks amounting to $4,000. During 1938 *194 petitioner gave Rosa Seidl a check for $801.72. It consisted of payment of $150 salary and $651.72 alleged interest. Opinion The first issue to be determined is whether or not petitioner was engaged in a trade or business within the meaning of section 23(a) of the Revenue Acts of 1936 and 1938. [1] Respondent places emphasis on the fact of petitioner's sustained losses between 1937 and 1942. In support of his contention that petitioner was not engaged in a trade or business he relies on such cases as Thacher v. Lowe, (D.C., N. Y., 1922) 288 Fed. 994; Commissioner v. Widener, (C.C.A. 3rd, 1920) 33 Fed. (2d) 833; Deering v. Blair, (App. D.C., 1928) 23 Fed. (2d) 975; Cecil v. Commissioner, (C.C.A. 4th, 1939), 100 Fed. (2d) 896. *195 We have carefully read this line of cases, comparing the facts therein with those before us here, without discussing each in detail. It is sufficient to say that we find in the cited cases elements not appearing in the instant matter, where it can not be doubted that the activities involved were not by way of mere hobby, or exercised by one whose principal occupation was something else, but were in pursuit of the petitioner's life-long and primary occupation, that of professional singing. The fact that even her gross income was very small in comparison with the expense does not control, particularly, in our view, under the exceptional circumstances here involved. The evidence establishes clearly, we think, that the petitioner was attempting to make profits, and was not merely spending money in a social way or as mere living expense. Respondent also argues that "The instant case is similar to Chaloner v. Helvering, (App. D.C. 1934) 69 Fed. (2d) 571 * * *." As indicated before, petitioner in the instant case claims that she has been in this business all her adult life while the record in the Chaloner case discloses that the petitioner, there, was an independently wealthy *196 man, who for 20 years indulged his hobby of writing books, without realizing any income therefrom. It is also noted that the case was not decided on the fact that losses occurred. The court said: "From the facts in this case it does not sufficiently appear that petitioner's activities as a writer and publisher of books were conducted during the taxable years involved either for a livelihood or for profit, and consequently did not constitute a trade or business within the terms of the Revenue Act." If any one factor is decisive in resolving the oft litigated question of whether a trade or business is being conducted, it is the presence or absence of a profit motive. Helvering v. Highland, 124 Fed. (2d) 556, (C.C.A. 4); Doggett v. Burnet, 65 Fed. (2d) 191. "The real test is whether the operation was carried on as a business for gain or whether it was carried on for recreation or pleasure. And this question is largely a matter of the intent of the petitioner. Thomas Sheridan, supra; Samuel Riker, Jr., Executor, 6 B.T.A. 890." Edwin S. George, 22 B.T.A. 189, 195. *197 In our opinion, petitioner had such a motive. Such is the uncontradicted evidence before us and we see no reason to disbelieve it. We think that it shows that she conducted her affairs with the view of making profit. It is clear to us that she embarked upon the venture with the intention of operating at a profit, and the fact that substantial losses inured in the taxable years, in no way detracts from the conclusion that petitioner carried on her activities as a trade or business. Doggett v. Burnet, supra.Nor do we consider that the fact that expenses were greater than receipts in former years, should control the question in these years, when attempts were being made to engage again in professional work. Respondent argues further that petitioner used this means of continuing the illusion of a famous donna and that she could not bear to slip out of the public eye. We can see no difference between petitioner's position and that of an ordinary singer. If it be a fact, as it is earnestly urged by respondent, that petitioner is fond of her career and that her vainglory is enhanced, that does not alter intention or change the character of the undertaking. It is well established *198 that business expense must be both ordinary and necessary to be deductible under section 23(a). Welch v. Helvering, 290 U.S. 111. In arguing this point, respondent appears to attack the individual items of expense on the ground of lack of proof. The question of what is ordinary and necessary in such a trade or business is a broader question. There seems to be no doubt that certain expenditures are necessary in carrying on such a concert organization as in the instant case. We have found as a fact that certain expenditures are required. Such expenditures are advertising, entertainment of concert managers, traveling expenses to place of concert, salaries and fees of such associates as pianist, accompanist, flutist, maid and secretary, an office, special music, professional coaches, special theatrical costumes and make-up. Irregularities found in the secondary evidence offered in the absence of original evidence, as proof in this case, affect seriously the value of the evidence as to the expenditures claimed. Exhibits 26 and 26-a have been admitted as proof of expenditures for *199 1937; and exhibit 10 has been submitted as proof for 1938. The testimony of the witness, claiming to have prepared exhibit 26 is conflicting as to when it was prepared. She first said it was prepared shortly after petitioner's return from Europe; later she testified from a leading question that it was made up "when the year ended." The witness testified that she saw a check stub or a check for "every one" of the items appearing thereon. Later testimony indicated that some cash expenditures appeared on the exhibits and for these she testified that she saw "slips or books or something to show that". With no more information than this about the exhibit the question arises in our mind as to the possibility of duplications between the so-called cash expenditures and the alleged check expenditures. However, a more serious question than this is concerning the fact that by far the most of the claimed expenses are preceded by a check or check stub number. The witness who prepared the exhibit claimed that she saw either a check stub or a check for every item. It is our belief that this, of itself, does not establish any proof whatsoever. A canceled check would offer some proof but just seeing *200 a check for an item does not offer any evidence of payment. The fact of seeing a check stub is even less evidence of payment; here it could be possible that the check written may have been destroyed (or lost) before delivered and if delivered it might not have been presented to the bank for payment; and still another possibility a check may never have been written for the stub. Just because a stub has been written is no indication that such a payment has been made. This same argument is applicable to exhibit 10 which purports to be a similar computation for 1938. The irregularities of the testimony of the witness is further demonstrated in that she testified that "They [papers comprising exhibit 10] were made out for the taxes and were delivered to the accountant to make up the return." When the exhibit was offered in evidence the respondent's attorney objected on the ground, among other things, that the exhibit had been prepared for income tax purposes. Further questions asked by petitioner's attorney indicates that the purpose of preparation of these papers was to keep petitioner's records straight and for the income tax. Furthermore, "They were prepared soon after she returned *201 from her trips." The use of the plural words "they" and "trips" in this sentence indicates that the witness is talking about exhibits 10 and 26 and that now she is claiming they were prepared soon after petitioner's return from Europe in February 1937 and October 1938. Exhibit 26-a establishes no further proof than was included on the schedule attached to the tax return. The amounts shown on that exhibit, with few exceptions, are nothing more than the totals appearing in the tax return and in the case of the exceptions the breakdown gives no proof of payment. The payment of $1,000 rent deduction of which is claimed for each of the years, has not been substantially proven. Furthermore, there is no definite or convincing evidence of what part of petitioner's apartment should be considered as an office. The proof of the payment of the alleged $1,500 per year secretary salary is also lacking. It is given in total amount and therefore offers no further proof than was offered in the tax return where the same amount was claimed. On brief petitioner argues that the $1,500 per year was not paid to one secretary, but that, over the two year period it was paid to a number of persons, including *202 public secretarial service. It is hardly credible that the amount would come out to exactly the same amount, $1,500 for each of the years, when a number of persons were allegedly employed, part of them being employed through public secretarial service. This viewpoint of the exact amount of $1,500 takes on more significance when the record as a whole is considered, in consideration of the fact that so much stress is placed on the exactness of the amount claimed. The only documentary proof of payment for a secretary consists of exhibit 26-a, showing the round figure $1,500 as paid for secretary for 1937, and, on exhibit 10 the figure $20 paid to "Willoughby." The $1,500 is of course a mere summary made at a later date, and the testimony of payment of salary merely referred to and relied on the exhibit, therefore is considered of no greater value.the $20 in 1938, taken together with Miss Willoughby's testimony that after about 1926 she was not definitely in the petitioner's employ, on occasions went to see Miss Hempel and on some such occasion prepared the papers (the above exhibits), indicates that there was no regular expense for a secretary in the taxable years. There is no proof of *203 any secretary other than Lois Willoughby, at any time, and no proof sufficient to justify more than a small amount for secretarial service. We have therefor allowed $100 for each year as a deduction for secretary. A claim for one-half of petitioner's automobile expense is made for 1937 with no proof as to the amount the automobile was used in her profession or even any proof that an automobile was necessary. Neither is there any explanation in the evidence as to allocation of telephone and telegraph expense. There is some evidence that petitioner used her telephone for personal use but no indication as to the amount in comparison to business use. Petitioner claimed deductions in her 1937 and 1938 returns in the amounts of $9,592.07 and $12,001.98 for business expense incurred and paid during those years. At the hearing, petitioner and her secretary testified that she had spent those amounts during the particular years. They did not offer any original documentary evidence to support these amounts. We do not consider the evidence before us sufficient to justify us in holding that the full amount claimed by petitioner was actually spent and we find that we are especially handicapped *204 by the complete lack of any evidence of any kind from which we can estimate petitioner's business expense other than by use of the amount she claims. Our ultimate findings of fact as to allowable deductions to petitioner are predicated upon the belief that petitioner did incur some expenses with respect to her business. The generally unsatisfactory nature of the testimony, as pointed out above, has required, however, that we use our best judgment in determining the amounts allowable by the taxpayer for the purposes alleged. Such determinations are made pursuant to Cohan v. Commissioner, 39 Fed. (2d) 540, and in accordance with recent decisions by us to the same effect. Lucien I. Yeomans, 5 T.C. 870, 875; Maurice A. Mittleman, 7 T.C. 1162, 1170. Petitioner presented testimony to the effect that certain expenses are necessary for the operation of a concert organization and we note that some of the expenses claimed in the schedule of the returns, such as insurance and storage expense, are not included in the testimony, hence, such expenses are not considered in the allowable amounts. Under the rule of the Cohan case and upon all the evidence *205 in the record, we have determined that petitioner's ordinary and necessary and allowable business expense for the year 1937 amounted to $4,100 and for 1938, $5,530. Respondent argues that if we hold contary to his contention on the above point, then the deductions claimed by petitioner with respect to the year 1938 must nevertheless be disallowed under the provisions of section 116(a) of the Revenue Act of 1938. [2] It is respondent's contention here that petitioner's gross receipts of $16.20 during 1938 constituted earned income as defined in section 25(a), Revenue Act of 1938, [3] that she was a bona fide nonresident for more than six months in 1938, therefore, under section 116 such earned income "shall not be included in gross income and shall be exempt from taxation," and that therefore her expenses outside the United States, being "properly allocable to or chargeable against amounts excluded from gross income" may not be allowed deduction. The petitioner suggests that the respondent did not specially plead section 116. However, the petitioner was not misled in this respect, section 116(a) having been, in respondent's opening statement at trial, expressly stated as relied upon. *206 The petitioner pleads no surprise. The section will be considered. Millar Brainard, 7 T.C. 1180. The petitioner also states, in effect, that the section is a relief section, to be liberally construed, and to be applied only at the election of the taxpayer, and therefore here inapplicable because the petitioner did not elect to exclude the foreign income. The statute says that such earned income "shall not be included" (italics supplied) in gross income and shall be exempt. The petitioner cites no authority bearing on this section or helpful on the point; and she overlooks section 24(a)(5) of the Revenue Act of 1938, which specifically provides that deductions of amounts allocable to exempt income are not allowable. The matter is, therefore, plainly not elective. James F. Curtis, 3 T.C. 648; George W. P. Heffelfinger, 5 T.C. 985. Again, petitioner's contention that she was not a "bona fide nonresident," within the statute can not be sustained. Prior to its amendment it is considered as applicable if there was, as here, mere physical absence from the United States for six months. Arthur J. H. Johnson, 7 T.C. 1040; Commissioner v. Estate of Fiske, 128 Fed. (2d) 487. *207 *208 The petitioner also advances the view, in opposing the respondent's argument above stated, that under sections 116(a) and 25(a)(4), of the Internal Revenue Code, she was engaged in a business involving both capital and personal services, that therefore her only "earned income" was 20 per cent of the "net profits" of such business, that the expenses being greater than the $16.20 gross income, there were no net profits, and therefore no earned income to exclude from gross income, so that there was nothing against which expenses were properly allocable or chargeable, with the result that the expenses do not come within the category denied deduction by section 116(a). The argument is ingenious, but, in our opinion, based upon a false premise - that petitioner's earned income was from business entailing both capital and personal services, within the language of the latter part of section 25(a)(4). The income was, instead, from "professional fees," within the first part of the same subsection, so that all of it was earned, not merely 20 per cent of net profits. Percy A. Yalden, 20 B.T.A. 372, involving an accountant. See also G.C.M. 9716, *209 X-2 C.B. 304. The amounts incidentally necessary for the pursuit of petitioner's profession do not, in our view, constitute capital, but merely expenses. We conclude and hold that petitioner's gross income in Europe in 1938 was earned income, therefore to be excluded from gross income, and that the expenses of earning it are "properly allocable or chargeable against amounts excluded from gross income," so can not be allowed deduction. We have therefore in the amounts of expense allowed, in our findings of fact, omitted and have not allowed deduction of the expenses during the six months in Europe in 1938. (2) Should the amounts received by petitioner during the years 1937 and 1938 from August Heckscher or from the August Heckscher Trust be included as taxable income during those years? Petitioner, though she reported the amounts in 1937 and 1938, now says this was error, and argues that the amounts received from Heckscher during 1937 and 1938 were not taxable income under the Sixteenth Amendment. Here she contends that the payments were "received in satisfaction of a judgment" and therefore not within the definition of income within the Sixteenth Amendment. Furthermore, that the *210 payments "may represent compensation for having given up a personal right - the right to accept engagements requiring her absence from New York City for more than two days." Another contention in addition to the relinquishing of her personal rights was that the dissolution of her concert organization caused the destruction of the good will she had built up over many years. The amounts in controversy under this issue are as follows: For 1937 - $17,055.62, which comprises the payment of a judgment by Heckscher to the attorneys of petitioner in the amount of $19,751.89 (this amount included the amount of the judgment plus interest). The attorneys remitted to petitioner $15,555.62 after deducting their fee and additional disbursements of $4,196.27, Petitioner had already claimed a deduction of $1,500 legal expense applicable to 1937 and this amount added to the $15,555.62 gives the amount of $17,055.62 which respondent claims should be added to petitioner's income. Petitioner also questions the inclusion of the full amount of the payments of the $15,000 regular payments received from or through the trust during 1937 and 1938. *211 The mere fact of receiving payment of a judgment does not of itself render the amount nontaxable. It must first be determined for what the payments were made. In the instant case it is evident that this amount represents income. The two collateral agreements entered into contemporaneously with the trust agreement placed responsibilities on both petitioner and Heckscher. Heckscher stopped the payments of the amount provided for in the agreement in 1935 because he claimed petitioner had not lived up to her contract, and the court awarded petitioner a judgment because she had lived up to it. Petitioner being on the cash basis, the time to report such income, derived from contract, was when she received it. The giving up of personal rights - the right to accept engagements requiring her absence from New York City for more than two days was in the first agreement between petitioner and Heckscher in which she was to receive $48,000 per annum and out of which the trust agreement in the instant case arose. This provision, that of not leaving New York City, was not incorporated in the later trust agreement or the two collateral agreements. However, if that part of the first agreement can *212 be used as a criterion of what is intended by the trust agreement and the two collateral agreements, there would be a much stronger reason for holding the agreements to be bilateral contracts, for by the original agreement petitioner was to sing for Heckscher's charitable organizations whenever requested to do so. This was clearly a contract of employment. However, we do not find that the "giving up of personal rights," as contended by petitioner, was incorporated in the agreements here under consideration. There has been no showing of the value of good will claimed to have been lost. The mere fact that petitioner had made money in days past from her concert organization does not establish any basis of the good will. See Raytheon Production Corporation, 1 T.C. 952; affd., 144 Fed. (2d) 110; cert. denied, 323 U.S. 779; R. J. Durkee, 6 T.C. 773. Petitioner's second contention is that if any portion of the amounts received were income, they were taxable in 1928, when the dispute out of which they arose became a "closed transaction." Reliance is placed on the following cases: K. R. Kingsbury, 31 B.T.A. 1126; William E. Freeman, 4 T.C. 582; *213 Richard R. Deupree, 1 T.C. 113; Renton K. Brodie, 1 T.C. 275. Petitioner's contention is based on the erroneous assumption that there was a "closed transaction" in 1928. By the trust agreement, Heckscher or his legal representative, had the option to terminate the payments in case petitioner should violate any of the terms of the two collateral agreements entered into contemporaneously with the trust agreement. In the agreements petitioner agreed to do both positive and negative acts. Among other things, she agreed to deliver to Heckscher certain writings, agreed to cremate others and deliver a certificate of cremation, agreed not to publish certain material and also agreed not to communicate with or molest Heckscher. Petitioner released Heckscher from the cause of action then pending and agreed to save him harmless from any action that might be brought against him by her former husband. These additional responsibilities on the part of petitioner lead us to believe that the transaction of May 11, 1928, was not a "closed transaction" but rather created a bilateral contractual relationship between the parties. The fact that she agreed not to publish certain *214 material and also not to communicate with or molest Heckscher makes the agreement a continuing contract which could be terminated at any time her actions were such as to bring her in conflict with these provisions. Since Heckscher could have stopped payment if petitioner's actions had not measured up to the terms of the contract, we can not say that the agreement of May 11, 1928, resulted in an arrangement that could be classified as a "closed transaction" and thereby creating a taxable transaction on the value of the trust at that time. Due to the fact that the contract could be terminated at any time by the petitioner not living up to her agreement it would be highly difficult to place a value on it at any date. Since the agreement provided for definite continuing responsibilities on the part of petitioner, the contract must be interpreted that the continuing payments provided for petitioner performing the conditions therein set forth and therefore were taxable in the year received. Petitioner also advances the argument that the payments constituted a gift, but we see no semblance of a gift; rather, we feel that the above discussion forecloses any contention of gift. Petitioner's *215 further argument is that if the settlement in 1928 did not result in taxable income in that year, then the amounts received must be taxed as an annuity, under section 22(b)(2), Revenue Act of 1936. [4] It is argued here that petitioner surrendered rights valued at $265,515 in return for an annuity of $15,000. After close study of the facts before us, which need not again be reviewed on this point, we are of the opinion that the amounts were not received as an annuity under an annuity contract, but *216 were received in lieu of petitioner's continued performance of the contract. See Frederick John Wolfe, 8 T.C. 689. 3. Petitioner argues, in the alternative, that if it should be found that the payment from Heckscher was income, it should be taxable when distributable, rather than when received, under section 162(b) of the Revenue Act of 1936. [5]
Petitioner received no payments *217 from Heckscher or the trust during the year 1936 or for the last quarter of 1935. On or about January 28, 1937, she received a payment from Heckscher through her attorneys in the amount of $15,555.62. This amount represented the judgments against Heckscher for the last quarterly payment of 1935 and the payments for 1936, less the attorneys' fee, and additional disbursements. It is not necessary to decide whether the trust income was taxable to petitioner when distributable, because the trust did not have any income in 1936, hence no problem of distribution. The trust was to pay petitioner only if its net income was sufficient; otherwise Heckscher should pay. Furthermore, the payment of the last quarterly payment of 1935 was made by Heckscher pursuant to the judgment against him, therefore, it appears that there was not sufficient funds in the trust account to make that payment. Since the trust had no money to distribute and the actual payment was made by Heckscher to petitioner through her attorneys, and in pursuance to the judgments, such amount would not be taxable until received, since petitioner was on the cash basis. Moreover, judgments were never rendered against the trustees. *218 They were to be rendered against the trustees only if Heckscher paid the amounts over to the trustees, and against the trustees only if they received the money. Since Heckscher never paid the moneys to the trustees, and finally in 1937, paid it directly to the petitioner, obviously there is no connection between the payments received by the petitioner and the trusts; therefore the moneys can not properly be regarded as distributable by the trusts. 4. Under the above facts, is petitioner entitled to a credit of $400 for a dependent for the years 1937 and 1938 under section 25(b)(2) of the Revenue Acts of 1936 and 1938? [6]
Upon consideration of the record herein we have come to the conclusion that petitioner is not entitled to the claimed credit for *219 a dependent. It is well established that under section 25(b)(2) of the Revenue Acts of 1936 and 1938 for a taxpayer to claim a credit for a dependent he must be the chief support - more than half - of the claimed dependent. There must be actual financial dependency; the dependent must be under 18 years of age or incapable of self-support because mentally or physically defective. If any one of these prerequisites is missing, it is well established that the credit for the dependent must be disallowed. It is our conclusion that petitioner did not establish that she was the chief support of her niece, Gertrude Freund. We are aware of petitioner's testimony that her niece did not own any property, also that her foster mother was not able to contribute to her support, however, this of itself does not establish that petitioner was the chief support, especially in lieu of her statement on cross-examination which was as follows: "Q. Do you know how much money it took for her support? "A. That I don't know. "Q. And you don't know whether the amount you sent her was half of what it took to support *220 her or more or less? "A. No, I don't know if it was all enough." To determine whether or not petitioner contributed more than half of the support of her niece, it is necessary to know the total amount spent for such support. Petitioner testified that she did not know the amount and the record otherwise is void as to that fact. Therefore, we have no alternative than to deny the credit for a dependent as claimed by petitioner. 5. Should petitioner be allowed a deduction for interest alleged to have been paid in 1937 and 1938 under section 23(b) of the Internal Revenue Code? [7]
*221 The Supreme Court has held that the usual import of the term interest "is the amount which one has contracted to pay for the use of borrowed money." Old Colony Railroad Co. v. Commissioner, 284 U.S. 552; Deputy v. DuPont, 308 U.S. 488. The fact that petitioner and her witness both testified to the payment of interest, avails petitioner nothing due to the lack of proof that there was ever any contractual duty on the part of petitioner to pay interest on the money alleged to have been borrowed. The record fails to establish any such contract. Nor was any maturity date for debt established. This question is not novel before the Court since it appeared in A. Backus, Jr., & Sons, 6 B.T.A. 590. There, petitioner, a corporation, was claiming a deduction for the payment of interest in 1920 on an advance of $10,000 made to the corporation in 1909. Even though the payment was called interest on the books of the corporation, the amount was disallowed where the Court said, "there is no proof that the corporation was ever under any liability to pay interest upon the $10,000 advanced * * *." The same is true of the alleged interest payments in the instant *222 case. The deduction is denied. 6. In the determination of the deficiency as to 1937, the Commissioner added a penalty of 10 per cent, under section 291 of the Revenue Act of 1936, [8] for failure to file return within the time prescribed, and without reasonable cause. Upon hearing, petitioner agreed therewith, admitting that the late filing of the return was not "for a due and reasonable cause, as provided for by the Code, so that issue will be dropped." Later, however, on trial, the respondent moved to amend his answer to conform to proof to increase the penalty to 25 per cent, instead of the 10 per cent as determined in the deficiency notice, and was, on October 11, 1946, allowed five days in which to file his amended answer in writing, as prescribed by our Rule No. 17. Amended answer was not filed within the time fixed by the Court, but was filed on October 22, 1946, without permission applied for or given to file out of time. The application for increase of deficiency is, therefore, denied, and the penalty at 10 per cent sustained. *223 Decision will be entered under Rule 50. Footnotes
*. The figures for 1938 are after omitting expenses claimed to have been incurred during the six months spent in Europe, but disallowed.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
2. SEC. 116. EXCLUSIONS FROM GROSS INCOME. In addition to the items specified in section 22 (b), the following items shall not be included in gross income and shall be exempt from taxation under this title: (a) EARNED INCOME FROM SOURCES WITHOUT UNITED STATES. - In the case of an individual citizen of the United States, a bona fide nonresident of the United States for more than six months during the taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts would constitute earned income as defined in section 25 (a)↩ if received from sources within the United States; but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection. 3. SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. (a) Credits for Normal Tax Only. - There shall be allowed for the purpose of the normal tax, but not for the surtax, the following credits against the net income: * * *
(4) Earned Income Definitions. - For the purposes of this section - (A) "Earned income" means wages, salaries, professional fees and other amounts received as compensation for personal services actually rendered, but does not include any amount not included in gross income, nor that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income producing factors, a reasonable allowance as compensation for the personal services actually rendered by the taxpayer, not in excess of 20 per centum of his share of the net profits of such trade or business shall be considered as earned income.↩
4. SEC. 22. GROSS INCOME. * * *
(2) Annuities, etc. - * * * Amounts received as an annuity or endowment contract shall be included in gross income, except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this title or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity.↩
5. SEC. 162. NET INCOME. The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that - * * *
(b) There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the beneficiaries, and the amount of the income collected by a guardian of an infant which is to be held or distributed as the court may direct, but the amount so allowed as a deduction shall be included in computing the net income of the beneficiaries whether distributed to them or not. * * *↩
6. SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. * * *
(2) Credit for Dependents. - $400 for each person (other than husband or wife) dependent upon and receiving his chief support from the taxpayer if such dependent person is under eighteen years of age or is incapable of self-support because mentally or physically defective.↩
7. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(b) Interest. - All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.↩
8. SEC. 291. FAILURE TO FILE RETURN. In case of any failure to make and file return required by this title, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.↩