WILLIAM E. FREEMAN AND HELEN A. FREEMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1361.    Promulgated January 16, 1945.

*John W. Burke, Jr., Esq.*, for the petitioners.
*Scott A. Dahlquist, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge*: The petitioner contends that nothing received in the settlement represented income for 1939 and the Commissioner was, therefore, in error in including any part of the $80,000 in taxable income. He argues that there was at that time merely the substitution of one annuity for another—in fact, a smaller annuity for a larger one, so that, if anything, there was a loss. He also argues that he was on an accrual basis and should have accrued in 1929 or 1930 the then value of the annuity represented by the letter of March 7, 1929. He points out that the Commissioner was informed from year to year of the situation and the error can not be corrected by including any lump sum in income for 1939.

The result in this case does not depend upon what method the petitioner has used for reporting income, but, as a matter of fact, in returns prior to 1936 he had reported that he was using a cash basis. Therefore, although he stated in later returns and in his testimony that he was on an accrual basis, nevertheless, the record does not justify a finding that he was using an accrual basis in 1929 and 1930.

The petitioner worked for many years for the Brady estate. Apparently he did whatever work the Bradys told him to do. He asked for additional compensation for his services. Nicholas, in consideration of his "services past, present and future," agreed to pay him as consulting accountant $12,000 a year for the petitioner's life. It is nowhere suggested that this was unearned or a gift. Nothing was reported as taxable income prior to 1939. No amount was reported in 1929 or 1930 representing the cost or value of an annuity contract. No annuity was purchased at that time. The letter represented a contract of employment under which the petitioner might receive payments for life provided he fulfilled his part of the bargain. No regular and unconditional annuity was purchased. It would appear that no amount was taxable at that time under the principles announced later in *Renton K. Brodie*, 1 T. C. 275, but whatever he received in payments would be taxable income as received. Nothing was ever reported in prior years, so it is clear that he had no cost or basis for income tax purposes which should be recovered tax-free. The reduction in annual receipts did not represent any loss for tax

purposes. It meant only that his taxable income would be less. Where a man has a prospect of receiving $12,000 a year which would be taxable income as received, he certainly has no loss for income tax purposes when the amount actually received is less.

A change took place in 1939, the taxable year. The petitioners at that time received and accepted the equivalent of $80,000, $8,660.80 of this was in cash and the balance was used to purchase annuity contracts as might be selected by the petitioners. Clearly, the cash was all taxable income under section 22 (a). It represented monthly payments of $1,000 for several preceding months, all of which was compensation for services rendered. The petitioners were offered the balance in cash, but they refused and agreed, instead, that the balance should be used to purchase annuities for them from an insurance company. Under such circumstances the entire amount used to purchase the annuity contracts is taxable income. See *Richard R. Deupree*, 1 T. C. 113; cf. *George Matthew Adams*, 18 B. T. A. 381. Furthermore, these contracts of the insurance company to pay annuities were quite a different thing from the petitioners' rights under the letter from Nicholas Brady dated March 7, 1929. They represented the absolute right to receive the annuities, with no conditions whatsoever, whereas the Brady letter was a mere promise to pay compensation under the circumstances described in the letter. It was simply a letter from the employer and not an absolute contract or annuity. The amount paid for the annuities is taxable income under the principle of the *Brodie* case, *supra*, and would be so even if the petitioners had not been offered the full amount in cash and had not been allowed to select the annuities themselves. We hold that the cost of annuities purchased to compensate the petitioner for services is income in 1939 under the circumstances here present. Payments under the annuity contracts may be reported properly under section 22 (b) (2), and for that purpose $71,339.20 will represent their cost.

Reviewed by the court.

*Decision will be entered for the respondent.*

---

KERN, *J.*, dissenting: By the contract of March 7, 1929, embodied in the letter of Nicholas Brady to Freeman, petitioners were entitled to the payment of $12,000 a year during the life of Freeman, and of $8,000 a year during the life of Mrs. Freeman if she should survive her husband. This was more than "a prospect of receiving $12,000 a year"; it was a contractual right against a solvent obligor, and can only be described as a right to an annuity. Whether that annuity was a retirement annuity or an annuity given to Freeman as com-

pensation is immaterial, since the tax year before us is 1939 and not 1929. The question in this proceeding is not whether petitioners were subject to tax upon the receipt of this right in 1929, but whether they are subject to tax upon the receipt in 1939 of two annuity contracts and an amount of cash taken by them in compromise of the rights under the 1929 contract. It is also immaterial that this right of Freeman under the 1929 contract might have been conditional in 1929 or 1930 upon his rendering services to Brady as a consulting accountant upon Brady's request. This condition was removed by Brady's death in 1930.

The important fact is that in 1930, at the death of Brady, Freeman had a valid unconditional right to an annuity for himself and his wife as against Brady's estate. He filed a claim based thereon against the estate and its validity was acknowledged by the executrix and a deduction on account thereof was allowed to the estate by respondent in computing estate taxes due. This deduction was in the sum of $112,513.20. Payments were made to Freeman for many years by Brady's estate. In 1938 a successor executor was appointed for Brady's estate. He pointed out to the Surrogate's Court that the estate could not be closed until the death of the survivor of petitioners unless some settlement could be made with petitioners for their rights under the annuity contract made by Nicholas Brady. If an insurance company were to be substituted as the obligor under the annuity contract held by petitioners the cost to the executor, as pointed out by it in its petition to the court, would be approximately $142,700.

The executor, faced with that situation, decided to stop making the payments to petitioners called for under its decedent's annuity contract and to dicker with petitioners with regard to a settlement of their claims under that contract. The executor dickered successfully from the standpoint of the estate. Instead of having to purchase substitute annuity contracts from an insurance company at a cost of $142,700, the executor was able to persuade petitioners to give up their rights under the 1929 annuity contract executed by Brady, which, according to the executor's petition to the court, had a value in 1939 of $130,070, and to accept in return for the relinquishment of those rights two annuity policies issued by an insurance company at a cost to the executor of $71,339.20, plus $8,660.80 in cash, the latter sum being a little in excess of the unpaid monthly installments due under the 1929 contract up to the date of settlement.

The net result of the transaction from the standpoint of the executor was that it could close the estate of its decedent and at a cost of $80,000 instead of $130,070; while from the standpoint of the petitioners they had given up an annuity calling for the payment during their joint lives of $12,000 a year and during the life of the survivor of $8,000 a year, and now had, instead of such an annuity

payable by an estate having net assets of approximately $1,800,000, annuity contracts executed by an insurance company, one calling for the payment of $3,610.32 a year during their joint lives and thereafter to the survivor and the other calling for the payment during the life of William E. Freeman of $2,402.04 a year. In addition they received in cash $8,660.80.

It requires no reference to actuarial tables to conclude that the value of the annuities received by petitioners in 1939 was far less than the value of the annuity to which they were entitled under the Brady contract of 1929. However, if one does refer to the actuarial table set out in Regulations 105, p. 31, this conclusion may be verified. The difference in value is considerably greater than the $8,660.80 received by petitioners in cash.

It is to these facts that the majority opinion applies the doctrine of *Richard R. Deupree*, 1 T. C. 113, and *Renton K. Brodie*, 1 T. C. 275.

As we pointed out in the *Brodie* case, the taxpayer in the *Deupree* case was "in the position to go to the company and say: 'You have some money which, under the special remuneration plan adopted, I am entitled to receive in cash. However, I would prefer to have * * * that cash invested in an annuity contract.'" In the instant case Freeman was not entitled to receive $80,000 in cash as special remuneration for his services during the taxable year. He was entitled to annual payments of $12,000 for life which had no reference to services performed during the taxable year but constituted an annuity given to him 10 years before as a retirement pension or as compensation for services ended in 1930, or, perhaps, as both pension and compensation for work performed long prior to the taxable year. The fact that Freeman was offered in compromise for this right the sum of $80,000, which offer was refused, can not support a conclusion that he constructively received this amount. Freeman wanted annual payments and was entitled to receive annual payments. A rejected offer to compromise his rights to annual payments by the payment of one lump sum can not make him taxable on the lump sum by any doctrine of constructive receipt.

The *Brodie* case was one in which the annuity was purchased as extra compensation for the employee's services rendered during the taxable year there involved, and was "intended as extra compensation for services performed in the taxable year," as we pointed out in *Charles L. Jones*, 2 T. C. 924, 931. In the latter case we reviewed the administrative rulings with regard to the taxation of annuities and the plain inference of that case is that the rule of the *Brodie* case will be applied only to cases having the same unusual facts, since, in the ordinary case, the administrative rulings have already set up equitable and fair methods for taxing annuities.

Nevertheless, the majority opinion extends the rule of the *Brodie* case to the instant proceeding in which an annuity was not purchased as extra compensation for the employee's services rendered during the taxable year and was not intended as extra compensation for such services, but was purchased as part of a compromise of previously existing rights to an annuity.

The practical results of the majority opinion are startling. Petitioners were entitled during the taxable year to receive $12,000 annually for the life of Freeman. They took in compromise of this right $8,660.80 in cash and two annuity contracts calling for the payment of $6,012.36 a year for the life of Freeman. These annuity contracts had no cash surrender or loan value. If the compromise transaction had occurred in 1945 instead of 1939, the tax upon petitioners would have been in excess of $50,000. This tax of $50,000 would have been the result of a transaction by which petitioners had given up more than they received and by which petitioners had received in cash only $8,660 plus two annuity contracts which they could not sell and against which they could not borrow.

It is an understatement to say that such a result is unfortunate. Since it is also contrary to the system for the taxation of annuities set up by administrative regulations and rulings, and is not required by any of the decided cases, I respectfully dissent from the majority opinion.

ARUNDELL and LEECH, *JJ.*, agree with this dissent.

———

MELLOTT, *J.*: I agree with much that is said by Judge Kern in his dissenting opinion. In my judgment Freeman and his wife should be taxed annually upon the amounts received. This would be reasonable and fair to the fiscus and to the taxpayers and the administrative difficulties mentioned in the concluding paragraph of the opinion in *Charles L. Jones*, 2 T. C. 924, would be obviated.