FREDERICK JOHN WOLFE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7287. Promulgated March 31, 1947.

*James O. Wynn, Esq.*, *William Galbally, Jr., Esq.*, *James H. Hayes, Esq.*, and *Henry B. Burr, Esq.*, for the petitioner.

*Sheldon V. Ekman, Esq.*, for the respondent.

690

694

OPINION.

DISNEY, *Judge*: Petitioner contends that the monthly payments received by him from Standard are an annuity and that he is taxable on the amount received under section 22 (b) (2) of the Internal Revenue Code.[1] His argument is limited to the following points:

I. The amounts received by petitioner from Standard Oil Company of New Jersey were received as an annuity under an annuity contract.

[1] SEC. 22. GROSS INCOME.

*   *   *   *   *   *   *

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

*   *   *   *   *   *   *

(2) ANNUITIES, ETC.—

(A) In General.—Amounts received (other than amounts paid by reason of the death of the insured and interest payments on such amounts and other than amounts received as annuities) under a life insurance or endowment contract, but if such amounts (when added to amounts received before the taxable year under such contract) exceed the aggregate premiums or consideration paid (whether or not paid during the taxable year) then the excess shall be included in gross income. Amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this chapter or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity. *  *  *

II. The amount paid by Anglo-American Oil Company, Ltd. to Standard Oil Company of New Jersey was the aggregate premium or consideration paid for such annuity.

The respondent contends, in substance, that the amounts received by the petitioner represent not an annuity, but additional compensation for services, and are therefore taxable in full, and that, even if the payments received are an annuity, the petitioner is taxable in full because he contributed none of the cost of the annuity.

Our first inquiry, therefore, is whether the payments are "Amounts received as an annuity under an annuity   *  *  *   contract," within the text of section 22 (b) (2) of the code. If so, only 3 per cent of the consideration or aggregate premiums paid is taxable (at least if paid by the petitioner, and that question we need not decide just here in considering only and primarily whether the payments were received as an annuity under an annuity contract).

After close study of the facts before us, we are of the opinion that the amounts were not received as an annuity under an annuity contract, but were received as a pension in consideration of services rendered in prior years. We can not and should not close our eyes to the realities presented in this case. By petitioner's own words he says that it was his understanding when he undertook the assignment of chairman and managing director of Anglo, at the request of Standard, that if he were eventually retired from the services of Anglo he would receive a life annuity based on the provisions of the superannuation scheme of Anglo in effect on the date of retirement and that payments of such pension in sterling would be guaranteed by Standard in dollars at an exchange rate of $5 to the pound. The agreement of March 22, 1940, contains the following paragraph:

AND WHEREAS, the Anglo Company desires to recognize Mr. Wolfe's valuable services to the Anglo Company by contributing to the Standard Company a capital sum of £89,120-0-0 representing the liability which it would have incurred had it granted Mr. Wolfe a sterling pension equivalent to that payable under the superannuation scheme of the Anglo Company.

Soon after arriving in England the petitioner discussed the matter of his retirement with officers of Anglo, and after some discussion it was decided that he was entitled to service as of June 1902 (the date when he entered the employ of Queen City Oil Co., Ltd., predecessor of, and absorbed by, Imperial Oil Co., Ltd., which was owned largely by Standard), and on October 22, 1931, the resolution of the directors of Anglo stated, "that for the purpose of calculating pension payable by this Company to him," his services should be deemed to commence from June 1902, "and that he be entitled to pension on the same basis as employees benefiting under the Company's Superannuation Scheme." Thus it is seen that, though he did not come strictly

within the provisions of Anglo's superannuation plan, he was to be treated as if he did—"entitled to *pension* on the same basis" as employees so situated. (Italics supplied.) The procedure finally carried out was a mere way of effectuating a pension for the petitioner. It was not, in form, any usual commercial annuity. Such an annuity was, in fact, considered, and the idea not carried out.

In our opinion, the arrangement carried out here provides "benefits from a retirement fund" in the nature of pension compensating for services rendered. The petitioner actually received money in the taxable years. It is clearly within the broad sweep of income as defined by section 22 (a),[2] and, the Commissioner having determined it to be such, it is petitioner's burden to demonstrate otherwise. So attempting, he relies primarily on section 22 (b) (2). The provision thereof, so far as here involved, is summed up in the words "annuity" and "annuity contract." Their usual connotation does not, in our view, encompass the plan carried out in this matter; and no sound ground is suggested for broadening the concept to cover the contract here considered. The petitioner suggests that it was an annuity because Standard might make a profit or suffer a loss in its execution, depending on the length of life of the petitioner, and relies on a definition of annuities in the law of New York. Such law does not control interpretation of section 22 (b) (2), and we see nothing in the possibility of profit or loss to Standard to cause consideration of a plan for additional compensation as an annuity. Nor does the fact that Regulations 111, sec. 29.22 (b) (2)-2, states that amounts received as an annuity "include" amounts received in periodic installments, demonstrate that we have an annuity here. The regulation does not say that every periodic payment is annuity.

We regard this case as in essence analogous in principle to *Hooker v. Hoey*, 27 Fed. Supp. 489; affd., 107 Fed. (2d) 1016, where it was held that there was no annuity. There, too, the payments were made to reward long service. No annuity contract was purchased, the employer, Vacuum Oil Co., making payments until its property and obligations were transferred to Standard Oil Co. of New York, which, under its new name of Socony Vacuum Corporation, continued the payments, including the one in question. Though the retirement plan was called "Annuity Plan," just as here the word annuity is some-

---

[2] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

times, though not always, used, the court regarded the name of "no particular importance," adding: "It was manifestly a pension plan, a retirement allowance plan, and the payments made under it were payments of pensions or retiring allowances." Referring to the change from one corporation to another as payor, the court said that "All that happened was that Socony Vacuum Corporation took the place of Vacuum Oil Co. as payor of his pension or retiring allowance." So here we think Standard of New Jersey merely took the place of Anglo and the earlier companies, so far as obligation for pension retirement was concerned. The court in the *Hooker* case, referring to the contention that there was annuity because of the assumption by Socony Vacuum of the obligation of Vacuum, says:

* * * In the first place, the plaintiff has no annuity, within the meaning of that word in section 22 (b) (2). He has a pension or retirement allowance, taxable under section 22 (a) of the Act as already shown. The exemption as to annuities in the income tax statutes does not cover cases where an annuity is not in reality purchased, even though the transaction may be somewhat analogous to the purchase of an annuity. *Helvering* v. *Butterworth*, 290 U. S. 365, 369, 370, 54 S. Ct. 221, 78 L. Ed. 365. In the second place, the transaction involving transfer of assets by the Vacuum Oil Company and assumption of liabilities by Socony Vacuum Corporation was not an "annuity contract," except in a forced sense. * * *

We think there is not here more than in a very "forced sense" an "annuity contract" by virtue of the arrangement between petitioner and the two companies. In this connection we should recall that the amounts paid the petitioner were based upon service from 1902, when he entered the employ of Queen City Oil Co., later absorbed by Imperial Oil Co., owned largely by Standard, and continuing through the approximately ten years of employment by Anglo, Standard stock controlled. If, as in effect the petitioner argues, Anglo simply purchased an annuity contract from Standard as a mere vendor thereof, why should it be based in part on service rendered for earlier employers? But it extends back to Queen City Oil Co. That company's part of any retirement fund was, when it was "absorbed" by Imperial, passed to Imperial in effect in the same way as in the *Hooker* v. *Hoey* case. Absorption of a corporation by another involves obligations, if any, as well as assets. Then we see that, at the request of Standard and on the understanding and guaranty of Standard that petitioner would receive a pension, he undertook the "assignment" with Anglo, and finally Standard, "in consideration of the aforesaid understanding," agreed to pay petitioner the $3,038.75 per month for life, Anglo making a "contribution" to the fund necessary. The letter of January 9, 1940, from Standard to Anglo states that Standard will "guarantee Mr. Wolfe that the money which you have provided, *plus* the additional amounts which Standard * * * will be required

to put up, will be used to assure him the annuity to which he is entitled." (Italics supplied.)

It thus becomes clear, in our view, that Standard is no simple seller of an annuity, but in effect is taking over retirement obligations of its affiliate, Imperial (covering from about 1911 or 1912 to 1931, at least half of the whole period covered, and about twice as long as the period with Anglo)—in the same way, in substance, as was done by Standard of New York in the *Hooker* case; and that, moreover, the stock control by Standard of Anglo (through Standard Oil Export Corporation) indicates reason, further than the "contribution" by Anglo, for Standard taking over payment of the pension. To the extent of at least about two-thirds of the period on which retirement was based, Standard is in a position similar to that of Standard of New York in the *Hooker* case, and even more directly itself the payor of its own pension obligation because of the understanding it had with petitioner when he took the assignment to Anglo. Though the petitioner seeks to distinguish the *Hooker* case, on the ground that there was assumption of liabilities by the successor corporation (which paid the "annuity"), whereas here Anglo paid money to Standard, we think there is no real distinction. In that case Vacuum Oil Co. transferred property to Standard of New York, which assumed Vacuum's obligations and liabilities (including, of course, the liability to pay the "annuity"), and thereafter paid the petitioner such "annuity"; whereas herein Anglo paid Standard of New Jersey money, and Standard paid petitioner. There can be no real difference between the transfer of assets by Vacuum and the transfer of money by Anglo. There was consideration in both cases for the payment to the petitioners. In *Ware* v. *Commissioner*, 159 Fed. (2d) 542, property was exchanged for fixed monthly installments to be paid during lifetime and it was held that the fact of conveyance of property did not prevent the payments from being annuities; therefore, in the *Hooker* case it would make no difference whether the assumption of liabilities was because of receipt of property, instead of money.

The 89,120 English pounds paid to Standard of New Jersey by Anglo was in the words of the agreement of March 22, 1940, merely "a contribution *toward* the cost of the annuity settlement." (Italics supplied.) The letter of March 22, 1940, forwarding the agreement to Anglo, also refers to Anglo's "contribution." Moreover the agreement expressly states that the petitioner "undertook this assignment [with Anglo] at the request of the Standard Company on the understanding that if he were eventually retired from the service of the Anglo Company he would receive a life annuity based on the provisions of the superannuation scheme of the Anglo Company * * * and that payment of such sterling pension would be guaranteed by the

Standard Company." This language makes it plain that Standard and petitioner had had an understanding, from prior to the Anglo "assignment" and that it was backed by Standard's guaranty.

The contract of March 22, 1940, recognizes previous obligations on the part of Standard, for petitioner "accepts this annuity settlement as a complete discharge of any and all *pension obligations* of the Standard Company, the Anglo Company and any other associated companies." (Italics supplied.) Standard is thus again seen to be involved in this matter, not as a mere seller of an annuity contract, but by virtue of its previous commitments and affiliations. The letter of August 4, 1939, from Anglo to Standard states that "the procedure entails obligations on all parties." Also, the letter of August 20, 1931, passing between Standard's "Secretary of Annuities and Benefits Committee" and the officer "in charge of foreign sales" reveals that if Anglo's annuity plan did not "fully take care of Mr. Wolfe's case * * * the matter will have to be given special consideration"; and notations on that letter state that Anglo is to adopt the same rules basically as Standard "with such additions as will care for employees of their own subs." [3] To us this indicates that Standard had a duty to Wolfe; otherwise, Standard would not be concerned with his annuity—the matter would not "have to be given special consideration."

Moreover, the notations indicate the general idea of a company associated with Standard taking care of the "employees of their own subs.," and explains Standard's interest in retirement for Wolfe from 1902 to 1940. It appears further that Standard itself is contributing to the retirement fund. The letter of January 9, 1940, shows that Wolfe's retirement would require the money Anglo provided "plus the additional amounts which Standard * * * will be required to put up." There is no showing that £89,120 was required to cover petitioner's retirement, so far as concerned the years of service with Anglo, and the evidence indicates otherwise. We note also that in the letter from Standard dated June 29, 1939, it is stated, "it is further proposed that Anglo transfer to S. O. of N. J. for deposit to the sub-account for assigned expatriates in the Annuity Fund the estimated present value of Anglo's liability." This has the sound of mere contribution by Anglo to a general fund, rather than purchase of annuity. Moreover, a computation sent under date of June 21, 1939, by Standard's secretary of its annuities and benefits committee to one Pierce of that company, shows "total cost" as $467,165, assuming retirement at July 1, 1940, and his "annuity" to be $34,131. The $34,131 is, according to the computation, the annuity in dollars at $4.68 a pound, whereas Wolfe was actually paid at $5 a pound, or $36,465 ($3,038.75 a month).

---

[3] This instrument was read into the transcript, but placed, marked "read into the record," among the exhibits. We quote from the instrument, which obviously was misread, the transcript reading "service" instead of "subs."

"Total cost" would therefore appear to be higher than $467,165. The amount "contributed" by Anglo, at then current exchange rates, was $415,786.75. All this appears to mean that the amount of money necessary to produce even $34,131 per year was $467,165. If so, Anglo obviously did merely "contribute." If it cost about $467,165 for an "annuity" of $34,131, one of $36,465 would, ratably figured, cost about $499,111, which is not greatly different from what is indicated by the estimated figure of $491,000 in pencil notations at the bottom of the letter of August 4, 1939, from Carder of Anglo to Pierce. Since Anglo paid only about $415,000, the $491,000 figure was apparently placed on the letter by some one with Standard. Since £87,177 was the amount stipulated to have been paid originally by Anglo, we conclude that that amount, and the £1,943 later paid, was merely cost to *that company*. Moreover, even if Anglo was providing the entire amount necessary, it is obvious from the fact of coverage of years prior to service with Anglo that it was doing so because of its relation to Standard, and not because the approximately 10 years of service performed by petitioner for Anglo required the "contribution" of the full amount of 89,120 pounds sterlings. We can not say, on all such evidence, that Anglo purchased an annuity from Standard.

We conclude and hold that the moneys received by the petitioner in the taxable year were not "Amounts received as an annuity under an annuity *. * * contract," within the language of that section. Nor is the contract made in 1940 otherwise shown to have been a contract taxable to the petitioner in 1940 (though not reported by him as Federal income or to Canada or England.)

The petitioner upon brief argues and particularly emphasizes that: "*The petitioner, in 1940, was a non-resident alien, and income received by him from sources outside the United States was not subject to tax in the United States.*" He therefore argues that he was "clearly not liable" to the United States. In addition to the above admission, in effect, it is not shown that he was liable to taxation by Great Britain or Canada upon the "annuity" or pension retirement contract of March 22, 1940. Therefore, strictly speaking, such nontaxability by the United States and failure to show taxability by any other country involved, justifies the conclusion that the petitioner has not shown himself entitled to the deduction claimed; for, in *Charles L. Jones*, 2 T. C. 924, we considered, as here, a claim for deduction of the amount annually received under a "service annuity" contract purchased by his employer from an insurance company in a previous year, and, after reviewing *Renton K. Brodie*, 1 T. C. 275, and others along that line, we said that:

* * * Congress intended to limit the deduction under section 22 (b) (2), *supra*, to the aggregate premiums or consideration paid by the annuitant except

where, as in the *Deupree* and *Brodie* cases, supra, the annuitant has been in receipt of *taxable income* in the year in which the annuity was purchased for him by his employer. [Italics supplied.]

We approved taxation to the petitioner of the annual amount received from the insurance company. So, if the petitioner had not "taxable income" in 1940 in the "annuity" funds, he had nothing to recover tax-free later.

The contract of March 22, 1940, was, in effect, a mere agreement, in written form, to carry out the previous arrangement and agreement under which petitioner had worked and to pay additional compensation therefor. It was in no ordinary negotiable or assignable form, though we rely on that fact only as indicative of the intention of the parties. In our opinion, this is not the class of contract taxable at value to the recipient. The contracts in *Renton K. Brodie, supra; William E. Freeman,* 4 T. C. 582; *Hubbell* v. *Commissioner,* 150 Fed. (2d) 516; *Oberwinder* v. *Commissioner,* 147 Fed. (2d) 255; *Robert P. Hackett,* 5 T. C. 1325, and *Ward* v. *Commissioner,* 159 Fed. (2d) 502, cited by the petitioner, and all cases found by us following them, were all ordinary commercial annuity contracts, purchased by employers from insurance companies for employees; therefore, the fact that they were held taxable to the recipients is no indication that an agreement here by Anglo and Standard to carry out their pension policy should be considered to have such value as to be taxable to the petitioner as recipient, and therefore offer reason to allow exemption from tax of amounts received in later years under the contract.

Reviewed by the Court.

*Decision will be entered for the respondent.*