Davis, Judge,
delivered the opinion of the court:
Plaintiff is one of a large number of railroads which banded together in the late 1940’s to buy the Pullman sleeping car business. As a result of a Government antitrust suit, Pullman, Inc., the parent company of the Pullman interests, was required in 1944 to divest itself of either its car manufacturing business or its sleeping car activities. It chose to retain the former and therefore approached various railroads to purchase the assets or stock of The Pullman Company, the subsidiary which operated the sleeping car business. The interested roads formed the Railroad Buying Group which worked out the arrangements for the transfer of The Pullman Company and the assets of the sleeping car business. The Company’s stock was purchased for over $40,000,000, with the shares distributed pro rata among the buying roads. It was also agreed that the Company, once it was in railroad hands, would issue to the owning roads so-called “car notes” (the subject of this suit).
Plaintiff, which is on the accrual basis, received its “car note” in August 1947. The note was not assignable or transferable. The Pullman Company agreed to pay on June 30, 1948, the sum of $98,863, with interest at 3% from July 1, 1947. The principal sum was to be paid either in heavyweight sleeping cars (at a fixed value) or in cash out of a separate fund to be accumulated by the debtor. The cars *4 could be obtained immediately or at any time up to December 31, 1948; if the railroad receiving the note chose to obtain cars it would have to lease them back to The Pullman Company until December 31,1948 (but not thereafter). If cash were chosen, it could not be obtained before June 30, 1948, and was payable only to the extent money was available in the separate fund. This plaintiff decided, in 1947, not to take sleeping cars but to await the cash payment. In February 1949, The Pullman Company redeemed all outstanding car notes in cash, and at that time plaintiff received $98,863 — the face amount of the note. Interest was paid by The Pullman Company, as provided in the note, in 1947, 1948, and 1949. The plaintiff reported this interest as income but did not report the principal amount of the note at any time.
The Commissioner of Internal Revenue assessed and collected income tax, for 1949, on the $98,863 received in that year from The Pullman Company. Plaintiff paid the deficiency (and interest) and now sues for a refund.
The parties have narrowed the controversy to the single issue of the proper year in which the $98,863 was taxable, 1947 or 1949 (or perhaps both). Both sides assume (at least for this case) that the distribution by The Pullman Company was a taxable dividend; but they differ as to the time when that dividend was received. The taxpayer opts for the earlier year while the Government asserts that the Internal Revenue Service correctly chose 1949.
The Internal Revenue Code of 1939 defined a “dividend” as “any distribution made by a corporation to its shareholders, whether in money or in other property” (Section 115 (a)), and the regulations required a taxable distribution by a corporation to “be included in the gross income of the distributees when the cash or other property is unqualifiedly made subject to their demands” (Treas. Reg. Ill, § 29.115-1). There is, of course, no problem as to the amount to be included in gross income where the dividend is paid in cash; with respect to valuation of a dividend in kind, Section 115 (j) of the Code provided that “if the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the *5 time as of which it becomes income to the shareholder.” Under this governing law — established by the Code and the regulations — we must decide three points: first, what was the distribution made by The Pullman Company to plaintiff, i.e., the car note or the cash payment; second, in what year (1947 or 1949) was this distribution unqualifiedly made subject to plaintiff’s demands; and, third, what was the «.mount, of the distribution to be included in gross income. Though theoretically separable, these three problems are closely intertwined in this case, and we shall discuss them together.
Plaintiff obtained its car note in August 1947. It says — and defendant denies — that this note was valuable “property” in itself, received at that time. Promissory notes are usually such property, or the equivalent of cash, in the hands of the obligee (cf. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 468-69 (1933); Wolfson v. Reinecke, 72 F. 2d 59 (C.A. 7, 1934); Cowden v. Commissioner, 289 F. 2d 20, 24 (C.A. 5, 1961); Turner v. Commissioner, 303 F. 2d 94, 96 (C.A. 4, 1962) cert. denied, 371 U.S. 922), but that proposition is not universally true (cf. Schlemmer v. United States, 94 F. 2d 77 (C.A. 2, 1938); Cowden v. Commissioner, supra; Hudson v. Commissioner, 11 T.C. 1042, 1050-51 (1948), aff’d per curiam, 183 F. 2d 180 (C.A. 5, 1950); Crosby v. Commissioner, 14 B.T.A. 980 (1929)). Here, we believe, the note was so framed that it did constitute property in taxpayer’s possession as soon as it was received.[1] At that moment the taxpayer was in a position to demand valuable heavyweight sleeping cars in payment. The note was the equivalent of a declared dividend of sleeping cars which could be taken at any time in 1947. Under the Code and the regulations, the immediate availability of those cars gave rise to present *6 income. Treasury Regulations 111, § 29.115-1 called for the inclusion in shareholders’ gross income of property distributed by the corporation whenever it is “unqualifiedly made subject to their demands.” Regulations 111, § 29.42-2, establishing a general rule for determining when income has been received, likewise fits this case:
Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition * * *.
The sleeping cars referred to in the note were “made available” to the taxpayer in 1947 (subject to leasing back to The Pullman Company for a temporary period). They could be drawn in that year and their receipt was thus brought within the taxpayer’s own control and disposition at that time.
The defendant objects to this conclusion on three main grounds. It says, first, that the sleeping cars were not made available “without any substantial limitation or restriction” (as Treas. Reg. Ill, §29.42-2, supra, provides) because plaintiff was required, by its agreement with the other railroads, to lease back the cars to The Pullman Company until December 31, 1948, and to allow the Company to operate them during that period. But this minor requirement for a lease-back of no more than 17 months did not so fetter the taxpayer’s use of the property as to remove its distribution from the category of income. The Commissioner of Internal Revenue recognized this himself when he decided (see finding 11(b)), in responding to a request for a ruling by other participating railroads, that “the railroad companies were in receipt of dividend distributions at the time they elected to claim assigned sleeping cars by the surrender of their car *7 notes” — even though these companies had also agreed to the lease-back arrangement.
Secondly, defendant urges that plaintiff cannot have received income in 1947, through the availability of the cars, because it decided in that year not to take cars but to demand cash. This, too, is no answer since the cars were always available in 1947 under the terms of the note; the taxpayer’s internal decision not to exercise the option — subject, of course, to change until December 31, 1948 — would not mean that the cars did not remain “unqualifiedly * * * subject to [its] demands.” A taxpayer’s own choice to leave untouched money or property which is otherwise subject to his call does not ordinarily defer the receipt of income. See 2 Mertens, Law of Federal Income Taxation (1961), §§10.01, 10.05, 10.06; cf. Corliss v. Bowers, 281 U.S. 376, 378 (1930); Williams v. United States, 219 F. 2d 523 (C.A. 5, 1955).
Thirdly, defendant insists that the car notes had no independent significance but were issued only as part of the mechanics of a distribution by The Pullman Company among its stockholders of the sleeping cars (or their cash equivalent). We have been given no adequate reason why the notes should be disregarded. They are unusual in form and designed to meet an unusual situation, but nothing in the law of taxation directs the compulsory elimination of uncommon obligations. Nor is there any rule that notes with a present value are to be overlooked simply because they are non-negotiable and non-assignable.[2] In form and substance, these were promissory notes, payable immediately in heavyweight sleeping cars or after a year or so in money. As such notes, we have shown, they were property in the hands of the taxpayer in 1947. Only by fiat could we ignore them.
The remaining facet of the case concerns the value of the car note in 1947. If that amounted to less than the $98,863 paid in cash in 1949, there could (but not necessarily) be a further receipt by taxpayer of taxable gain in 1949 — the year *8 in. suit. Such further gain for 1949 [3] would have to be taken into account because, in this tax refund suit, taxpayer can only recover for that year to the extent it shows that no income tax was payable. Lewis v. Reynolds, 284 U.S. 281, 283 (1932), Reinecke v. Spalding, 280 U.S. 227, 232-33 (1930); Helvering v. Taylor, 293 U.S. 507, 514 (1935); Globe Gazette Printing Co. v. United States, 82 Ct. Cl. 586, 592, 13 F. Supp. 422, (1936), cert. denied, 298 U.S. 682 (1936).
On the record and findings we have, the value of this car note in 1947 remains unclear. Plaintiff urges that it had its full face value, either because the cars were worth that much or because the promise to pay the face amount in cash in 1948, plus interest, was worth that much in 1947. Defendant leaves the issue unanswered but suggests that the court must decide the “difficult question” whether the 1947 value of the note is measured by the worth of the cars (which taxpayer did not take) or by the value of taxpayer’s right to receive the cash in the future.
Under one oft-repeated principle of income taxation, the right which the note gave the taxpayer in 1947 to obtain a money payment in 1948 (or 1949) would not have any market value, or represent realizable income, in the earlier year. This is because the note was non-negotiable, non-assignable, and non-transferable. Unlike ordinary promissory notes or assignable paper, taxpayer would be unable to turn this obligation (if all that it did was to promise money in the future) into immediate cash (even at a discount) by selling or pledging it, or otherwise putting it up as security for a loan. There would be no way in which the holder of such a note could realize on it prior to the due date so as to entitle the Revenue Service to say that receipt of the note was tantamount to receiving cash. True, the obligor (The Pullman Company) was solvent and sound, and would doubtless honor its promise in due course. But the debtor’s solvency and willingness to pay the note when due is not the equivalent of the obligee’s having a present right or power to obtain money through use of the note. It has frequently been said! or implied that an obligation to pay in the future can have a *9 current market value, or represent current income, only if it is currently capable of somehow being traded, disposed of, or realized — i.e., negotiated, assigned, transferred, or paid. See, e.g., Cowden v. Commissioner, supra, 289 F. 2d 20, 22, 23-24 (C.A. 5, 1961); Crosby v. Commissioner, supra, 14 B.T.A. 980 (1929); Humphrey v. Commissioner, 32 B.T.A. 280 (1935); C. W. Titus, Inc. v. Commissioner, 33 B.T.A. 928 (1936); Kleberg v. Commissioner, 43 B.T.A. 277, 289 (1941); Freeman v. Commissioner, 4 T.C. 582, 584-85 (1945); Hudson v. Commissioner, supra, 11 T.C. 1042, 1050-1051 (1948), aff’d per curiam, 183 F. 2d 180 (C.A. 5, 1950); Fischer v. Commissioner, 14 T.C. 792, 801-802 (1950); 2 Mertens, Law of Federal Income Taxation (1961), Sec. 10.02 (p. 7), Sec. 11.05 (pp. 12-16), Sec. 11.06, Sec. 11.07, (pp. 21-23); cf. Bedell v. Commissioner, 30 F. 2d 622, 624 (C.A. 2, 1929) (“* * * it is absurd to speak of a promise to pay a sum in the future as having a ‘market value’, fair or unfair”, per L. Hand); United States v. Christine Oil & Gas Co., 269 F. 458, 460 (W.D. La., 1920), citing United States v. Schillinger, 14 Blatch. 71 (“In the absence of any special provision of law to the contrary, income must be taken to mean money, and not the expectation of receiving it, or the right to receive it, at a future time”).
The difficulty with uncritical acceptance of this principle for our case is that it has not been applied without exception toi all monetary obligations. The courts have held that, where an employer purchases for its employee a non-forfeit-able and unconditional annuity contract that is not assignable and has no cash surrender value in the purchase year, the employee is nevertheless taxable in that year (as additional compensation) on the amount expended by the employer to buy the annuity. Brodie v. Commissioner, 1 T.C. 275 (1942); Oberwinder v. Commissioner, 147 F. 2d 255, 258-259 (C.A. 8, 1945); Freeman v. Commissioner, 4 T.C. 582, 585 (1945); Anderson v. Commissioner, 5 T.C. 1317, 1324-25 (1945); Hackett v. Commissioner, 159 F. 2d 121 (C.A. 1, 1946); United States v. Drescher, 179 F. 2d 863, 865-66 (C.A. 2, 1950), cert. denied, 340 U.S. 821 (1950); Morse v. Commissioner, 17 T.C. 1244, 1248-49, 1252 (1952), aff’d 202 F. 2d 69 (C.A. 2, 1953). Since the employees could not receive *10 any money from tlie annuities during the taxable year, directly or indirectly, but had to wait for later years, the holdings in these cases seem to clash with the general principle that taxability in a particular year follows only upon some realizable value during that period. In Drescher, supra, the Second Circuit appears to have recognized this discrepancy (179 F. 2d at 864-65, 866), but it nevertheless chose to follow and extend its prior ruling in Ward v. Commissioner, 159 F. 2d 502 (1947), involving an assignable annuity contract, to cover a non-assignable agreement — holding that such a contract does and can have present value. Although both the majority and the dissenting opinions[4] are directed to that particular agreement, there is a general reach to the discussion of valuation which cannot be disregarded.[5] Mertens’ text also seems somewhat wary of any flat doctrine that non-transferability deprives an obligation of currently taxable value. Sec. 11.03 (pp. 6-8); Sec. 11.05 (pp. 15-16); Sec. 11.06 (pp. 17-18,20). See also Helvering v. Bruun, 309 U.S. 461 (1940).
We have concluded, however, that the non-assignable annuity cases represent an exception to the general doctrine, rather than a competing principle deserving of further development to include the present case. Perhaps those decisions turn on the special fact that the taxpayer’s beneficiary would recover, in the taxable year, the premium paid for the annuity if the taxpayer should die within that period; such a possibility of present recovery might give the otherwise unrealizable obligation a current value.[6] Or perhaps the *11 impelling force behind those rulings was the need to close a loophole through which the employee-taxpayers could escape paying income taxes on monies expended by their employers for their benefit. In any event, the theory of this line of cases has thus far been confined to its own sphere. To extend it to taxpayer’s note would make another, and wider, breach in the accepted principle that an obligation has to be realizable during the year — in some way and to some extent — before it can be taxed at that time. The advantage of that general rule is the relative ease and accuracy of determining when (and by how much) receipt of an obligation constitutes income. The test is the practical one of the market, in its broadest sense. To go further and require the current assessment of the worth of non-realizable or non-marketable obligations — instead of awaiting the actual receipt of money under those obligations — would thrust both taxpayers and the Internal Revenue Service into the briar-patch of valuation-sans-market. The new principle would necessarily have to be expanded, in logic, from fixed but non-realizable liabilities to cover contingent obligations (which can also be “valued”) — and the resrdt would soon be a profound shift in the tax treatment of obligations to pay money or transfer property in the future. The onerous task of valuing liabilities not readily evaluated would become much more frequent; and these added burdens (including the weight of increased litigation) would not appear to be counterbalanced by any significant improvement in the effective administration of the federal revenue laws. If the change is to be made, it seems to us it should be made by Congress (or perhaps the Treasury) after considering all the consequences, not in the ad hoo course of case-by-case adjudication.
It follows that the 1941 value of taxpayer’s non-transferable note should not be measured by its right in 1947 to receive cash in 1948 or 1949, but by its present right to receive sleeping cars in 1947. Taxpayer asserts that the sleeping cars were worth the full face value of the note, but the Trial Commissioner has made no finding to that effect and the present record is inadequate for us to make such a finding. The face value of the note may have been equivalent to the cars’ book value, but we are uncertain whether the book value *12 would correspond to tlie then market value of heavyweight sleeping cars. Unless the parties can stipulate the value of the cars, that issue will have to be determined by the Trial Commissioner in the further proceedings under Rule 38 (c). In the event he finds the value of the cars to be less than the face amount of the note, the Commissioner should also consider whether there was a “spill over” to 1949 for which taxpayer should be charged before recovering any excessive tax collected for that year.
Our conclusion is that plaintiff was taxable on the car value of its note solely in 1947, and not in 1949, unless there was the “spill over” to 1949 to which we have referred. Plaintiff is entitled to recover, with interest as provided by law, and the amount of recovery will be determined pursuant to Rule 38(c).
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) Plaintiff[7] seeks by this action[8] to obtain a refund of income tax and interest, assessed against and collected from plaintiff for the year 1949 pursuant to the Internal Revenue Code of 1939.[9]
(b) Plaintiff’s books are kept and its income tax returns are filed on the calendar year and accrual basis. Its income tax return for the year 1949 was filed with the Collector of Internal Revenue for the District of Colorado.
(c) Plaintiff’s claim for refund of deficiency and interest (assessed against and collected from plaintiff as recited in paragraph (a) above) in the amount of $7,358.37 was (1) filed with the District Director of Internal Revenue for the District of Colorado on or about January 15, 1957, and (2) formally rejected by the Commissioner of Internal Revenue by registered mail under date of September 17, 1957.[10]
*13 2 (a) In 1940, suit was instituted[11] by the United States under the Sherman Antitrust Act against Pullman, Inc., its three wholly owned subsidiaries, and various individuals. One of the subsidiaries, The Pullman Company, operated a sleeping car business. The other two subsidiaries operated a car manufacturing business.
(b) On May 8,1944, a final judgment of the court ordered Pullman, Inc., to dispose, at its election, of all of its interest in either the sleeping car business or the car manufacturing business. Pullman, Inc., elected to dispose of its interest in the sleeping car business operated by The Pullman Company.
(c) Accordingly, Pullman, Inc., approached various railroads in the United States which were then being furnished Pullman sleeping car service with the proposal to sell to the railroads the stock or the assets of The Pullman Company. Thereafter, 49 railroads formed into a Railroad Buying Group to conduct the negotiations and make the purchase. The Buying Group was subsequently augmented by the addition of other railroads, plaintiff being one of them.
3. (a) The negotiations developed the facts that (1) the railroads desired to acquire control of The Pullman Company and preferred to do so through the purchase of stock rather than through the purchase of assets; (2) the book value of the stock of The Pullman Company reflected substantial assets which were not considered necessary for the conduct of the sleeping car business; and (3) these assets raised the price of the stock of The Pullman Company to a figure which was higher than the railroads were willing to pay.
(b) Pullman, Inc., thereupon divested The Pullman Company of $65.8 million in assets which the Railroad Buying Group considered unnecessary to its purposes.[12]
*14 4. (a) By letter dated May 12, 1945, Pullman, Inc., offered to sell the capital stock of The Pullman Company to the Railroad Buying Group.
(b) The offering letter took note of the “disinclination” of the railroad representatives “to undertake a definite obligation to acquire, either directly or through stock ownership, the considerable number of heavyweight sleeping cars in the existing Pullman fleet at this stage in the trend toward lightweight equipment * * The letter then outlined, in some detail, a plan whereby the railroads could distribute the heavyweight cars among themselves on a “cash-or-car” basis, paying cash or giving evidences of indebtedness to which Pullman, Inc., would look for satisfaction, thereby taking the heavyweight cars out of The Pullman Company’s assets. Or, as the letter continued, “* * * if the Railroad Buying Group would prefer to have the heavyweight sleeping * * cars left in the ownership of The Pullman Company, without any debt obligation connected therewith, * * * the amount * * * involved in acquisition of the stock of The Pullman Company * * *” would be as stated in an attachment.
(c) As the transaction between Pullman, Inc., and the Railroad Buying Group was ultimately consummated, the railroads did buy from The Pullman Company, prior to the takeover, virtually all of its lightweight sleeping cars,[13] but elected to acquire ownership of The Pullman Company with the heavyweight sleeping cars still owned by it, “without any debt obligation” to Pullman, Inc., connected with the heavyweight cars. The railroads then worked out, as between themselves and The Pullman Company, a “cash-or-car” arrangement (hereinafter described) for the equitable distribution of the heavyweight equipment.
.5. (a) On October 18,1945, members of the Railroad Buying Group entered into a Memorandum Agreement among *15 themselves, as a foundation for accepting the offer of Pullman, Inc.[14]
(b) The Memorandum Agreement (1) listed the purposes of the Buying Group in purchasing the stock of The Pullman Company;[15] and (2) set forth a series of agreements between the railroads (members of the Buying Group) for carrying these purposes into effect.
(c) Among the agreements for carrying the purposes into effect were provisions whereby (1) the railroads agreed to purchase from The Pullman Company (and then lease back to The Pullman Company) all lightweight sleeping cars; (2) The Pullman Company, “being in railroad ownership,” would offer to sell to each railroad the heavyweight sleeping cars “regularly assigned to operation on that railroad at the end of * * * 1940 * * at a price representing their depreciated value on the books of The Pullman Company; and (3) the railroads would furnish funds, ratably, for payment of the purchase price in accordance with a defined formula.
*16 (d) The Memorandum Agreement contained the following provisions:
* * * For that portion of the purchase price payable to Pullman Incorporated which is attributable to heavyweight sleeping cars regularly assigned to the Railroads, parties hereto, available for purchase * * * The Pullman Company shall issue non-transferrable interest bearing notes, due not later than December 31, 1948, the principal to be paid in regularly assigned sleeping cars * * * and the interest in cash, and the capital stock of The Pullman Company shall be so adjusted as to represent the price of the remaining sleeping cars and other assets. * * *
* * * Upon any purchase of assigned sleeping cars by any Railroad * * * such Railroad shall pay the price therefor by the surrender at their face value * * * of notes issued to such Railroad * * * or in cash to the extent that such Railroad has no such notes. Amounts so paid in cash, * * * shall be set aside in a separate fund by The Pullman Company, and applied * * * to the reduction pro-rata of the principal amount of notes outstanding. * * *
6. (a) By letter dated November 7,1945, the Railroad Buying Group accepted the offer of Pullman, Inc., “to sell the stock of The Pullman Company * * * paying for the same in full in cash.”
(b) Whereas the acceptance “assumed” that the take-over date would be December 31, 1945, the necessary clearances required more time. The date, December 31, 1945, was nevertheless retained as the cutoff date for the settlement of accounts. The Closing Agreement, between Pullman, Inc., and the Railroad Buying Group, was dated June 30, 1947, and provided for a “delivery date * * * not later than July 31, 1947.” The transaction was closed accordingly.
(c) Section 2 of the Closing Agreement set forth the “agreed purchase price” for the stock of The Pullman Company as $40,202,482, based upon stated “agreed values at the cut-off date.” Among the agreed values was the following:
*17 Oars:
Heavyweight standard-class sleeping ears
(3,996) _$15, 358, 877
Heavyweight tourist class sleeping ears
(2,184) _ 4,368, 000
Lightweight sleeping cars (7 — representing
all that were left of 609)_ 307, 524
Total_ 20,034,401
(d) Section 8 of the Closing Agreement provided that on the delivery date Pullman, Inc., would “deliver for account” of the Railroad Buying Group “stock certificates for all outstanding shares of the capital stock” of The Pullman Company, and that the Buying Group would pay $40,202,482 therefor. The transaction was consummated accordingly.[16]
(e) Exhibit A, attached to the Closing Agreement, contained a schedule of each participating railroad’s share of the purchase price and the number of shares of stock it was to receive. Plaintiff’s share of the purchase price was shown to be $302,363, for which it was to receive 5,500 shares of stock.
7. (a) On June 21, 1947, plaintiff paid into the Buying Group’s fund the sum of $302,363, “representing this Company’s portion of the purchase price of The Pullman Company.”
(b) Thereafter, 5,500 shares of the capital stock of The Pullman Company were delivered to plaintiff.
8. (a) On August 13,1947, The Pullman Company issued to plaintiff its “non-transferable car note dated July 1, 1947, due June 30, 1948 * * *” whereby The Pullman Company, “for value received,”[17] promised to pay to plaintiff on June 30, 1948, the principal sum of $98,863, “* * * and to pay interest from July 1, 1947, on said principal sum * * * at the rate of * * * 3% per annum * * * semi-annually in cash”—
*18 * * * said principal sum to be paid only in regularly assigned sleeping cars or out of cash in the separate fund * * * (to the extent that cash in such fund may be available and so applied), as provided in the Memorandum Agreement * * *.
(b) The car note further provided (1) that “the principal sum of this note * * * may be applied to the purchase * * * not later than December 31, 1948, * * * of regularly assigned sleeping cars at a purchase price to be ascertained in accordance with” a formula stated in the Memorandum Agreement; (2) that the principal sum of the note could be reduced from time to time by The Pullman Company by the application of cash in the separate fund provided for in the Memorandum Agreement; and (3) that the note should not be transferred or assigned.
(c) Plaintiff’s right to take regularly assigned heavyweight sleeping cars in satisfaction of its car note in the year 1947 was absolute and unconditional and was at the sole discretion of plaintiff’s management. But the car note also incorporated by reference, as part of its terms, provisions contained in the Memorandum Agreement of October 18, 1945, (see finding 5), requiring any stockholder choosing to receive sleeping cars to lease them back to The Pullman Company for a period ending not later than December 31, 1948, and to enter into an operating agreement with the Company to operate the sleeping car service for that period.
9. (a) Car notes were issued by The Pullman Company to each of the 57 railroads comprising the Buying Group. The letter of transmittal from the Pullman Company to the contract railroads, dated August 13,1947, advised:
* * * Enclosed is a car note, dated July 1, 1947, which is issued to your Company in accordance with the provisions of the Memorandum Agreement * * * of * * * October 18, 1945.
Attached you will find the formula for the computation of the amount of the notes issued, with a statement by roads of the amount assigned to each stockholder.
It is our recommendation that these notes be taken up on your books at their face value as representing that proportion of your investment, and that the balance of your investment be shown as applicable to the investment in stock. * * *
*19 (b) Computations supplied by The Pullman Company with its letters of transmittal showed (1) the issuance of 57 car notes in the total amount of $13,142,352; (2) mathematical computation of the value of the notes to be issued as $12,822,470; (3) adjustment of the computation by adding to the $12 million figure the sum of $319,882, to make the $13 million figure; and (4) deduction of $319,882 from remaining asset values to show an adjusted value of the capital stock of $37 per share.[18]
(c) Two purposes of the Railroad Buying Group were served by the car notes. Their issuance (1) assured opportunity to all participants to share equitably in the distribution of the heavyweight equipment and (2) made possible further reduction in the per-share value of the stock of The Pullman Company, in anticipation of the Buying Group’s intention to sell the Company as a service organization.
(d) Upon completion of the transfer of the stock of The Pullman Company from Pullman, Inc., to the members of the Buying Group, and after the issuance by The Pullman Company of the car notes hereinabove described, plaintiff adjusted its books to show: (1) the sum of $203,500 paid by it for 5,500 shares of stock of The Pullman Company (representing $37 per share); and (2) the sum of $98,863 invested in its car note.
10. (a) Cash to be set aside by The Pullman Company for redemption of car notes, at the Company’s election, included (1) amounts collected for sleeping cars sold, wrecked, or otherwise disposed of, and (2) amounts representing depreciation accrued after the cutoff date (December 31, 1945). By April 30, 1948, funds so accumulated totaled $8,116,930.
(b) On February 7, 1949, The Pullman Company approved the redemption in cash of all outstanding car notes as of February 15, 1949. On February 10, 1949, plaintiff forwarded its car note to The Pullman Company and there *20 after received from the Company remittance in the sum of $98,863.[19]
(c) The Pullman Company paid to plaintiff the interest stated in the car note, and plaintiff listed such amounts in its tax returns as income during the years 1947, 1948, and 1949.
11. (a) On December 31,1949, 5 individuals, speaking for 33 railroads (plaintiff not being among them), requested of the Commissioner of Internal Revenue “a ruling as to the effect, for Federal income tax purposes, of certain transactions,” being a resume of (1) the purchase by the Buying Group from Pullman, Inc., of the stock of The Pullman Company, and (2) The Pullman Company’s subsequent transactions in connection with the car notes.
(b) By letter dated March 24,1952, the Commissioner of Internal Revenue replied. After summarizing the transactions as described to him, he advised:
On the basis of the information submitted, it is the conclusion of this office that the car notes were issued and distributed only as part of the mechanics of a distribution by Pullman among its stockholders of the sleeping cars. It is held, therefore, that no taxable gain was realized by the stockholders of Pullman (the railroad companies) as a result of the receipt of the car notes, but that the railroad companies were in receipt of dividend distributions at the time they elected to claim assigned sleeping cars by the surrender of their car notes. The amount of the distribution received by the railroad companies is measured by the fair market value of cars received in exchange for notes plus the amount by which the fair market value of any cars (or portions thereof) received in exchange for each exceeded the amount of cash paid. To the extent that the tax basis to Pullman of the cars distributed in exchange for car notes did not exceed Pullman’s accumulated earnings and profits available for the distribution of taxable dividends within the meaning of section 115(a) of the Internal Revenue Code, the entire amount *21 of the distribution represented taxable dividend income to the railroad companies. To the extent that Pullman’s accumulated earnings and profits were less than the tax basis to Pullman of the cars distributed, the excess of the tax basis over the earnings and profits constituted a return of capital and the balance of the distribution represented taxable dividend income to the railroad companies. Any cash received, by the railroad companies in redemption of car notes represented taxable dividend income to the extent provided in section 115(a) of the Code. [Emphasis supplied.]
12. (a) On January 15, 1957, plaintiff filed with the District Director of Internal Revenue for the District of Colorado its claim for a refund, advising that:
* * * Based on the ruling of [March 24,1952] * * * the revenue agent has held in the case of this taxpayer that taxpayer received ordinary dividend income in the year 1949 in the full amount of the car note, or $98,863. Upon this basis the Internal Revenue Service computed a deficiency in taxpayer’s income tax for the year 1949 in the amount of $5635.20, which taxpayer paid on April 20, 1955, together with interest of $1723.37.
(b) Following is plaintiff’s statement to the Director of Internal Revenue of its claim for refund:
* $ ifc jj: jj*
1. When the taxpayer paid to the buying group the sum of $302,363, it was the definite understanding of all parties concerned that $203,500 thereof was to constitute the purchase price of 5,500 shares of capital stock of the Pullman Company at $37 per share and that the balance of $98,863 was an advance to cover the cost (based on book value) of certain designated sleeping cars then owned by The Pullman Company. A time limit was fixed within which the taxpayer could elect to purchase said cars at said price. In the meantime, to evidence said advance or deposit, The Pullman Company issued to the taxpayer its interest bearing car notes of an aggregate face value of $98,863. The taxpayer elected not to purchase said sleeping cars and, accordingly, in 1949 The Pullman Company sold those cars to others and redeemed the car notes which it had issued to the taxpayer, at face value. In essence, the receipt of $98,863 by the taxpayer in 1949 was simply the return of a deposit which it had made in connection with a prospective purchase of sleeping cars which it never consummated. Under such circumstances, no taxable transaction is involved.
*22 2. Alternatively, taxpayer contends that the transaction covered by said memorandum agreement of 1945 involved the purchase by the members of the buying group of all the stock of The Pullman Company (and its assets), and, as a part thereof, a capital reduction of The Pullman Company immediately followed by a partial liquidation of The Pullman Company to the extent of the heavy weight standard sleeping cars (or cash equivalent) covered by the “car notes”. As a partial liquidation of The Pullman Company, therefore, the car note, in the amount of $98,863, should be first applied in reduction of taxpayer’s basis in the 5500 shares of stock of The Pullman Company for which it paid $302,363, with the result that no taxable gain or dividend income should be recognized on the transaction.
3. Alternatively, if it be considered that taxpayer received an ordinary dividend from The Pullman Company because of the “car note” transaction, taxpayer contends that such dividend was received in 1947 at the time it received The Pullman Company “car note” and not in 1949 when said car note was redeemed, so that the determination of a deficiency for 1949 was improper.
(c) Finding 12(b) sets forth plaintiff’s statement of its claim for refund as made to the Director of Internal Revenue. Plaintiff’s amended petition, filed September 3, 1959, omitted the ground stated in paragraph 1 of the earlier statement.
(d) The claim for refund was denied as stated in finding 1(c).
13. The parties have agreed, with the approval of the commissioner, that if plaintiff is entitled as a matter of law to recover, the amount of recovery shall be determined in further proceedings pursuant to Rule 38 (c).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined, in accordance with the opinion herein, under Rule 38(c).

 Since taxpayer received “property”, i.e., the note, in 1947, it is immaterial ■whether it was on the accrual or the cash basis. Moreover, the Treasury Regulations, supra, expressly provide that dividends are to be taken into income “when the cash or other property is unqualifiedly made subject to * * * [the taxpayer’s] demands.” It has been held that dividend income must be reported, even by an accrual basis taxpayer, at the time of receipt and not when the right to receipt is determined. Tar Products Corp. v. Commissioner, 130 F. 2d 866 (C.A. 3, 1942) ; Commissioners American Light & Traction Co., 156 F. 2d 398 (C.A. 7, 1946) ; Beneficial Corp. v. Commissioner, 202 F. 2d 150 (C.A. 3, 1953), affirming 18 T. C. 396 (1952) ; Frelbro Corp. v. Commissioner, 36 T.C. 864, 871 (1961).

 Cases in which the Tax Court held that non-negotiable notes had no value in the year of receipt turned on the particular terms of the note or the contingencies of payment, not on the mere fact of non-negotiability. Crosby v. Commissioner, supra, 14 B.T.A. 980 (1929) ; Hudson v. Commissioner, supra, 11 T.C. 1042, 1050-51 (1948), aff'd, 183 F. 2d 180 (C.A. 5, 1950).

 Taxpayer, as we hare noted, Included no part of the $98,863 In Its return for 1949.

 The dissent was solely on the measure of present value, not its existence.

 The majority in Drescher said (p. 865) : “It cannot be doubted that in 1939 the plaintiff received as compensation for prior services something of economic benefit which he had not previously had, namely, the obligation of the insurance company to- pay money in the future to him or his designated beneficiaries on the terms stated in the policy. That obligation he acquired in 1939 notwithstanding the employer’s retention of possession of the policy and notwithstanding its non-assignability.” The opinion then mentioned the following as indicating that the annuity had some present value (pp. 865i-66) :
(a) the right to receive income payments in the future has present value because one can purchase such future rights to income; (b) there is present value in the assurance of payment to his beneficiary if the annuitant should die; and (c) there is the possibility of the annuitant’s receiving cash, currently, “by contracting with a putative third person to hold in trust for him any payments to be received under the annuity contract.”

 See Drescher, supra, 179 F. 2d at 866; Hyde v. Commissioner, 301 F. 2d 279, 283 (C.A. 2, 1962).

 Plaintiff is a Delaware corporation, with its principal office in Denver, Colorado. It is a common carrier by rail, operating principally in the States of Colorado and utah.

 Jurisdiction is based on 28 U.S.C. § 1491.

 Section 115(a).

 There has been no assignment or transfer of this claim or any part thereof by plaintiff.

 In tie united States District Court for the Eastern District of Pennsylvania.

 Pullman, Inc., accomplished this result by reducing the par value of the stock of The Pullman Company from $100 to $10, thereby creating a capital surplus of $65.8 million, which surplus was then transferred by The Pullman Company to the parent corporation. On the books of The Pullman Company the (two) transfers of assets were designated “dividends in partial liquidation.” One “dividend” was in the amount of $50 per share; the other, $40 per share.

 These ears were purchased to the extent of $34,697,009, and the funds thus accruing to The Pullman Company represented part of its “liquidating dividends” to the parent company.

 A Supplement Agreement, dated November 20, 1945|, Is not material to the issues in this case, except insofar as it provided that The Pullman Company (or its successor), as a sleeping car service organization, should “* * * maintain * * * [a] pool of sleeping cars, to the extent required, by the acquisition if necessary of additional cars.”

 Following are excerpts from Article V of the Memorandum Agreement:
“The purposes of this Buying Group in buying the stock of The Pullman Company are as follows:
“1. To maintain without interruption orderly sleeping car service * * *.
“2. To afford means whereby every Railroad, subject to the terms of this Memorandum Agreement, may : (a) acquire all or any part of the sleeping cars regularly assigned to its lines; (b) conduct its own sleeping car operation * * * or arrange * * * for the conduct thereof by others; (c) perform its own service or maintenance * » * of sleeping ears used in operations on its lines; (d) procure such service or maintenance * * * through contract * * * with The Pullman Company * * *.
“3. To reduce The Pullman Company into, or to sell its properties to, a sleeping car service corporation within a period ending not later than December 31, 1948, which will terminate existing operating contracts and will offer: A. A contract to perform the so-called hotel servicing of sleeping cars for all railroads * * * ; B. A contract to supply, as available, excess sleeping cars, not purchased by individual railroads, upon proper terms to such railroads as may desire it; C. A contract to maintain sleeping car equipment owned by a railroad, or operate a shop owned by one or more railroads for such railroads as may desire it. * * *
“4. In connection with the reduction of The Pullman Company into, or sale of its properties to, a sleeping car service corporation * * * to offer to railroads individually or by groups at the then depreciated values the shops and miscellaneous properties * *

 The purchase price was paid for 731,350 shares of stock, representing $54.97 per share.

 No consideration passed from plaintiff, or any other recipients of car notes, to The Pullman Company for such car notes.

 As adjusted, The Pullman Company’s figures showed: (1) 731,350 shares of capital stock @ $37, $27,059,950 ; (2) car notes, $13,142,532; (3) total, stock and notes, $40,202,482, being the purchase price to Pullman, Inc.

 Plaintiff’s management had decided, in 1947, not to elect to take cars for the note. During the years 1947 and 1948 certain other railroads, members of the Buying Group, elected to use their car notes to acquire regularly assigned heavyweight sleeping cars, and such cars were transferred to them in partial or full satisfaction of their car notes.